[No. 23806. *En Banc.* February 16, 1933.]

M. MADISON et al., *Respondents*, v. R. A. McNEAL et al., *Appellants.*

R. A. McNEAL et al., *Appellants*, v. R. K. TIFFANY, *as State Hydraulic Engineer, et al., Respondents.*[1]

[1]Reported in 19 P. (2d) 97.

670

*H. E. Gorman,* for appellants.
*Ray R. Greenwood,* for respondents.

HOLCOMB, J.—These two causes were, by stipulation, consolidated for trial in the lower court and for hearing in this court. They involve a controversy over the right of the Madisons to a portion of certain waters produced by springs and dammed upon the property of McNeal and Wyatt, and to an alleged easement in the pipe lines used in the delivery of such water.

The first entitled action is an assertion of the rights to the water and easement, premised upon prescription and also upon a permit issued and granted by the state supervisor of hydraulics. The second action is an appeal to the superior court from the order of the state supervisor of hydraulics granting the permit above mentioned.

At the trial, the lower court sustained the contentions of plaintiffs in the first cause, granting them the right to .05 c.f.s. of water and an easement by prescription in the pipe lines and also by virtue of the permit above mentioned, and further enjoined defendants from molesting or interfering with plaintiffs in exercising such rights.

The second action, or appeal, was dismissed. Both causes have been appealed.

The facts are substantially these:

In about 1910, one Bourg became the owner of several tracts of land to the west of Dye's Inlet in Kit-

sap county, one of which, upon which was his home, fronted on this body of water. On the western portion of one of these tracts was a small stream formed from some springs, most, if not all, of which were on the Bourg property. In order to utilize this spring water for his home, in 1912 Bourg erected a dam across the stream, and from the reservoir so created laid some fourteen hundred feet of 5-inch wooden pipe, extending easterly to the rear of his house. The water so conveyed was used for domestic and irrigation purposes.

In 1914, the Madisons purchased from one Blackstone a tract of land adjoining the Bourg water front property on the north, and in the following year built a home thereon. Preceding the construction of the house, Madison, securing permission from Bourg, made a connection with the Bourg water main at the rear of his house with a three-quarter inch pipe, using the water for his own house, garden and stock.

In August, 1916, Bourg left with Madison a proposed written agreement, by the terms of which Bourg gave permission to Madison to connect a three-quarter inch pipe to the water main and have sufficient water for household purposes only, except by special permission during certain times of the day and certain seasons of the year to be specified by Bourg. The agreement also provided that, at the end of one year, Madison had the option to buy a permanent water right for two hundred and fifty dollars, with an annual fee of six dollars for maintenance, or he could pay thirty dollars a year as water rental. It further granted Madison the privilege of using one hose-nozzle or one automatic sprinkler for garden or lawn at times when the water supply was sufficient, Bourg to be the sole judge. This agreement was never signed by Madison, nor does it seem to have been discussed thereafter.

In 1919, Madison sunk a well on his property, believing that a change in water would be helpful to an ailing child, but continued to use the water from the Bourg property for outside purposes. In 1920, he installed a Delco lighting system, connecting it with the pipe from the five-inch main.

In June, 1921, the Madisons purchased a nine-acre tract from Bourg which was northwest of the other Madison tract. The course of this five-inch pipe line extended over the southern end of this tract, but the deed to Madison reserved to the grantor "the right to use, reconstruct and maintain pipe lines as now laid over a portion of the land conveyed." This deed also granted and conveyed

"Unto the grantee the right to build, repair, rebuild and maintain a dam across the creek which flows in an easterly direction . . . on the land of the grantors at any place below the dam which the grantors herein have built and now maintain across said creek . . . and the right to lay, maintain, operate, repair and remove pipes from said dam over and across the land of grantors for the purpose of conveying such impounded water to the land of the grantee in lot 4 [The water front property]."

This nine-acre tract was riparian to the stream below the dam of grantors. Thereafter, McNeal and Wyatt acquired title to the remaining property of Bourg and all of the property over which the five-inch pipe line was laid, except the nine-acre tract purchased by Madison in 1921.

While McNeal was living in the house formerly occupied by Bourg in 1922, Madison made a new connection with the five-inch main by means of a two-inch pipe extending from the main a little to the southeast of the southwest corner of his home tract, the two-inch main being laid to his house a distance of several hundred feet. This two-inch pipe was joined to the

three-quarter inch pipe before mentioned, which extended north from the five-inch main from the rear of McNeal's house.

In 1922 or 1923, a highway was constructed in front of McNeal's house. As this highway would necessitate the temporary removal of a portion of the five-inch main, McNeal secured the consent of Madison to connect a one and three-quarter inch pipe to the east end of the two-inch pipe and the use of the five-inch pipe at the highway was temporarily abandoned during the road construction, but resumed thereafter. In 1925, Davis, one of the defendants in the first cause of action, purchased the McNeal home.

In the spring of 1929, McNeal and Wyatt planted holly, and they objected thereafter to Madison using the water from the five-inch main, and threatened to, and in fact did, shut this water off. Thereupon, Madison made application for and secured a permit from the state supervisor of hydraulics for .05 c.f.s. Thereafter, within the statutory time, an appeal was taken from the order granting the permit, which constitutes the second action. In the summer of 1929, McNeal tore up some of the pipe leading from the five-inch main to Madison's property, and in the first cause Madison secured a temporary injunction and show cause order to prevent the further interference with his alleged right to use the water.

It is first contended by appellants that the Madison complaint is insufficient to give respondents the relief granted by the decree, because such complaint does not state a cause of action, or warrant the relief prayed for, it being argued that water in mains for distribution and the pipes laid in the ground of another, connected to a distributing main, are personal property, and not subject to an action for possession by adverse user.

674

As a general principle of law, water, after it has been diverted from a natural stream and taken into a reservoir and distributing pipes, takes the character of personal property, the ownership of which rests in the appropriator, although some authorities make exceptions. 2 Kinney on Irrigation and Water Rights (2nd ed.), p. 1340, states:

"After the diversion of the water from the natural streams into the ditches, canals, pipes, reservoirs, or other works of the appropriators, the title to the same changes, and the body or *corpus* of the water becomes the absolute property of the appropriators. Water, when collected in the works of the appropriator, and thus separated from the original source of supply, is considered his individual property, as much as the fish which might have been lawfully captured from the depths of the natural stream or the wild fowl which might have been shot or captured on its surface. In fact, it is a general principle of law that where an individual by his labor reduces to his control or use any object, animate or inanimate, which otherwise could not be brought under the control or use of man, that he acquires a right of property in such object, from which he can not be unlawfully dispossessed. . . .

"After water has been diverted from the natural stream and taken into the ditches, canals, and reservoirs of the appropriator and is thus in his absolute possession, by the great weight of authorities he has an absolute property right in the *corpus*, or very body of the water, which then takes the nature and character of personal property, and it is so regarded. It may be sold as personal property, and as such is subject to contract. . . .

"As a hereditament, a canal or reservoir full of water is certainly inheritable. There is a body or *corpus* to the water and it is visible and tangible. It follows, therefore, that such a body of water is a corporeal hereditament. After water has once been taken into the ditch, canal, or reservoir of the appropriator so as to be in his possession for the application to his uses it is a corporeal hereditament."

To the same effect is 1 Wiel on Water Rights (3rd ed.), § 35, p. 33.

But it is equally well established that the right to the flow of water to be used upon land, whether in its natural state or through pipes from a reservoir, is treated as an incorporeal hereditament, as distinguished from water alone, which is corporeal.

Kinney, *supra*, p. 1333, says:

"A water right is descendible by inheritance; and, being neither tangible nor visible, it is an incorporeal hereditament."

And also, p. 1328:

"A water right has none of the characteristics of personal property, . . . It is generally conceded by all of the authorities that a water right, or an interest in a water right, is real property, and it is so treated under all the rules of law appertaining to such property."

To the same effect is Wiel, *supra*, p. 299. See, also, Thompson on Real Property, 1929 Sup., p. 17.

That water rights for use upon the lands are considered appurtenant to the land and, therefore, realty, is declared by our statutes and prior decisions of this court. By the Laws of 1891, p. 328, it was provided that "The right to the use of water acquired by appropriation may be transferred like other property, by deed." By the water code of 1917, Rem. Rev. Stat., § 7391, "The right to the use of water which has been applied to a beneficial use in the state shall be and remain appurtenant to the land or place upon which the same is used. . . ." Certain provisos follow which do not change the principle that a water right is appurtenant to land.

In *Miller v. Lake Irrigation Co.*, 27 Wash. 447, 67 Pac. 996, this court, in sustaining an action to quiet title to a water right, held that "The allegation in the

complaint of ownership of the right to the use of the water is sufficient."

In *Barnes v. Belsaas,* 73 Wash. 205, 131 Pac. 817, which involves prescriptive rights, we said:

"The right to maintain an action to quiet title to water rights acquired by appropriation is well settled. *Miller v. Lake Irrigation Co.,* 27 Wash. 447, 67 Pac. 996. In Wiel on Water Rights, Vol. 1, § 283, it is said:

" 'Ditches and water rights may be sold on execution as real property. An action to quiet title as for real property is proper. And an action to settle rights is one to quiet title to realty.' "

In *Pate v. Peterson,* 107 Wash. 93, 180 Pac. 894, an action to quiet title to a prescriptive right to water and a ditch was sustained.

Hence, we conclude that we are not here dealing with water as personal property, but rather with an alleged water right as real property, and the action was maintainable by the parties.

The case of *Dunsmuir v. Port Angeles Gas etc. Co.,* 24 Wash. 104, 63 Pac. 1095, is not in point, because it does not involve water rights as appurtenant to land.

The next question is whether or not respondents sustained the burden of establishing a water right by prescription. The evidence doubtless shows continuity of use since about 1915 and that it has been with the knowledge and acquiescence of the original grantor as owner and his grantees, but we are unable to find any hostility toward, or invasion of, the rights of the owners by the Madisons over any ten year period. Nor do we find any evidence that Bourg or any of his successors in interest ever recognized any rights of the Madisons to the use of the water from the existing distribution system.

Respondents argue, however, that the prevailing rule is that, where the claimant has shown an open, visible, continuous and unmolested use of land for a period of time sufficient to acquire title by adverse possession, the use will be presumed to be on a claim of right, so as to place upon the owner of the servient estate, in order to avoid the acquisition of an easement by prescription, the burden of rebutting this presumption by showing that the use was permissive. Conceding, though not deciding, this to be the rule in this state, we are satisfied that any such presumption has been met and overcome by appellants.

The limitations on the water supply were evidenced from the beginning. Bourg first granted permission to the Madisons to connect with his main and use his water until he needed it, and he reserved the right to shut off the water at such time. Following this permission, Bourg submitted to Madison a proposed written agreement. The agreement fixed the cash value of the water right at two hundred and fifty dollars, with an annual fee of six dollars for maintenance, or an annual rental of thirty dollars. True, Madison did not sign this agreement, but the evidence shows that he caused a part, at least, of the maintenance of the system to be done at his own expense; and under the circumstances, it would seem that this contribution to maintenance was not intended as an indication of adverse rights.

In 1921, although Madison was then getting water from a system already installed, he accepted a deed to the nine-acre tract, which not only granted him the right to build a dam on the grantors' property and an easement for piping the water therefrom to the same tract for which he is claiming the prescriptive water right, but, by that deed, the grantor reserved the right to use, reconstruct and maintain the pipe lines then

existing. The very fact that Bourg granted a water right, although of uncertain value, in 1921, to be used as appurtenant to Madison's water front property, and acceptance thereof by Madison, seems inconsistent with the theory that Madison asserted a water right for the same property from another source.

When the two-inch connection was later made, Madison asked permission of McNeal, who then said he did not think there was enough water. So far as we can see, there was then no declaration of proprietorship by the Madisons; furthermore, McNeal, the Wyatts and Davis all knew of the water right and easement which Bourg granted to Madison at the time the nine-acre tract was deeded, because their respective deeds contained that reservation. From the facts stated, there was no reason for the successors of Bourg to feel that their conduct relating to or acquiescence in respondents' use of their water rights were ripening into a legal right in respondents to declare a forfeiture of a valuable property right which appellants must have felt they had.

Appellants did not need the water until about 1929. Up to that time, they were not being deprived of any use. There was no interference in their rights until that time, and they promptly took action when proprietorship was first asserted by respondent. There was plainly no acquiescence on the part of appellants which could ripen into a prescriptive right, and certainly there was no adverse or hostile use for the statutory prescriptive period. See *Schmitz v. Klee,* 103 Wash. 9, 173 Pac. 1026.

Respondents rely largely upon our decision in *Lyons v. Ingle,* 96 Wash. 95, 164 Pac. 745, reversing a former decision by the court in 91 Wash. 179, 157 Pac. 460. In the last decision, we held that, where under an agreement with an adjoining land owner plaintiff was

allowed to dig a ditch on the adjoining land and conduct water to his premises for irrigation, and for twenty years kept it in repair, the two owners using the ditch jointly, the evidence justified the finding of an easement and prescriptive right to one-half the water in the ditch. That decision was based upon an examination of the evidence, as to which we said:

"We think the evidence justifies the conclusion that Popple [the land owner], not only by his acts but by his declarations, recognized a right in the respondents to some proportion of the water, and that this, together with the long continued use of the water by the respondents, justified the trial court in finding that they were entitled as of right to a proportion thereof."

That case was decided upon its own facts, and manifestly showed such a long joint or common use of the water and acts and declarations by the land owner as to differentiate it entirely from this case. We consider it inapplicable to the facts here.

We have not overlooked the fact that on the nine-acre tract was a spigot which was attached to and formed a part of the distributing system; but this was maintained for the purpose of providing a vent at a high point in the pipe line in order to release air in the pipes and insure a better flow of water. This was not intended as a regular outlet for water; and moreover, the deed from Bourg to Madison not only gave Madison no right to use the water or pipe line, but reserved an easement therefor in the grantor. No right to the use of this pipe line or water could have accrued to the Madisons under the circumstances.

Our conclusion therefore is that respondents acquired no water right by prescription.

The state supervisor of hydraulics testified that the permit for .05 c.f.s., issued on July 13, 1929, to Elizabeth Madison, was based upon riparian own-

ership in the stream, and, in fact, the permit itself specifies that it "is in fact a recognition of the riparian right of the applicant to such water as may be required for domestic use." However, he also testified that, at the time of the issuance of the permit, he did not know of the grant from Bourg to Madison of the water right below the existing dam and the easement to construct a dam and distributing system upon grantors' property in order to utilize such water. It would seem that the lack of information as to the claimant having this particular right would justify the court in considering the rights of the parties without treating the permit as *prima facie* correct; but, in any event, the issuance of a water permit by the supervisor of hydraulics is not an adjudication of private rights. *Funk v. Bartholet*, 157 Wash. 584, 289 Pac. 1018.

We have in these cases water rights which exist by contract (the deed to the nine-acre tract), and also those rights asserted under the laws relating to the subject of water rights generally. Where a contract exists which settles water rights, due consideration must be given to such contract, lest the terms thereof be impaired by the application of general laws as if no such contract existed.

There is no doubt but what the Madisons possessed certain water rights, because the nine-acre tract is not only riparian to the stream below the present dam, but, as before stated, the deed from Bourg for that tract specifically grants the right to use the stream below the dam and also grants an easement for the construction of an additional dam and a distributing system upon and across the property of the grantor. Hence, it seems that, as between the Madisons and Bourg and his successors, the water rights were settled by the deed. The Madisons gave an easement for

the then existing pipe line which formed a part of a distributing system for water then being appropriated by Bourg, and Bourg gave the Madisons the right to the waters as they then flowed below the dam; and further gave an easement, whereby Bourg's property could be utilized in providing a distributing system for the water so deeded.

These grants cannot now be nullified by taking some of the water rights which the grantor retained and enjoyed and still leave the grantee with the water right and easement which the grantor surrendered and conveyed. This is not like the case of *State v. American Fruit Growers,* 135 Wash. 156, 237 Pac. 498, wherein we said that,

"If these cross-appellants have the right to use this seepage water and they permit it to augment the flow of the main creek, then it would seem but just and equitable that they should be permitted to take an equal amount of water, less transportation·loss, from some point higher up the creek, from which point it can be conveyed to their land by gravity; provided, of course, that by so doing they do not injure or interfere with the rights of anyone else."

In the case at bar, we have no indication from the Madisons that they would surrender their rights to the seepage from the dam, or would so repair the dam as to abate such seepage, nor do they express any willingness to surrender the water right and easement granted by the Bourg deed.

Even were we to say, which we do not, that the terms of the deed do not settle the rights between these parties, we should still be unable to sustain respondents' contentions. While we find no reason to question the water measurement as made by the state supervisor of hydraulics, the evidence shows that this measurement was made some forty feet below the dam, and that it included seepage therefrom. If we

comprehend correctly, the measurement fixed by the state supervisor does not constitute the amount of water being used by McNeal *et al.;* first, because of the dam seepage and second, because this seepage formed a part of the water right granted in the deed to Madison, conveying the nine-acre tract. Certainly, under this water right, Madison could prevent Bourg or his successors from diverting this seepage or any of the water which has formed the stream below the dam. If the Madisons are allowed to take water at or above the dam, they would also have, in addition thereto, the right to the stream below the dam, which right is premised upon the contract binding upon Bourg's successors.

From the facts presented, we are unable to say that there is any "surplus water" in or above the dam, as it has been maintained and operated for years, and upon a failure to make this showing it must be determined that respondents failed to sustain the burden of proof.

The judgment of the lower court must, therefore, be reversed.

ALL CONCUR.