**WASHINGTON WATER POWER COMPANY, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

Spokane Tribe of Indians, Intervenor.

No. 83–2051.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 11, 1984.

Decided Oct. 18, 1985.

Jerry K. Boyd, Spokane, Wash., with whom Peyton G. Bowman, III and Edward M. Leigh, Washington, D.C., were on brief, for petitioner.

Joel M. Cockrell, Atty., F.E.R.C., Washington, D.C., with whom Jerome M. Feit, Sol., and Joshua Z. Rokach, Atty., F.E.R.C., Washington, D.C., were on brief, for respondent.

Robert D. Dellwo, Spokane, Wash., with whom Gary T. Farrell, Spokane, Wash., was on brief, for intervenor Spokane Tribe of Indians.

Before TAMM * and MIKVA, Circuit Judges, and MacKINNON, Senior Circuit Judge.

MacKINNON, Senior Circuit Judge:

Two orders of the Federal Energy Regulatory Commission ("FERC" or the "Commission") hold that the Washington Water Power Company ("Washington Power" or the "Company") is required by the Federal Power Act, 16 U.S.C. § 791 *et seq.* ("FPA"), to obtain a license for its hydroelectric development which was completed in 1911 on the Spokane River at Little Falls, Washington. Washington Power claims it constructed, operates, and maintains the dam and associated structures under the authority of a special Act of Congress approved on March 3, 1905 (the "1905 Act"), and that the Little Falls dam therefore falls within the specific exceptions contained in sections 23(a) and 23(b) of the Federal Power Act.

The Commission contends for a different construction of the 1905 Act. It asserts that the 1905 Act did not authorize the construction of a dam, but only granted to the Company certain land and water rights ancillary to the actual construction of a dam and the occupation of the Spokane River. In addition, the Commission contends that in any case the Department of Interior's approvals under the 1905 Act of the application by the predecessor of the Company, and of the application of the Company itself, were insufficient to grant the Company the right to construct and operate the dam and the accompanying hydroelectric project, since the 1905 Act allegedly did not authorize the granting of the right to build a dam, but only the use of water and land. To occupy the Spokane River, which the Commission now claims was a navigable waterway of the United States, Washington Power allegedly should have secured permission from Congress and complied with the other requirements of sections 9 and 10 of the Rivers and Harbors Appropriation Act of 1899. 30 Stat. 1151 (1899) (codified as amended at 33 U.S.C. §§ 401 and 403 (1982)) (hereinafter cited as the Rivers and Harbors Act). The Commission held that having failed to do this, Washington Power did not have a complete "permit or right of way" prior to June 10, 1920 to construct or to operate the dam, and therefore the dam does not fall under the exceptions set out in sections 23(a) and 23(b) of the Federal Power Act. However, the 1905 Act incorporates by ref-

---

* Judge Tamm had fully concurred in this opinion prior to his death.

erence the water law of the State of Washington and provides that applicants for rights of way shall acquire water rights "by appropriation under and pursuant to *the laws of the State of Washington.*" This vital provision, which is basic to a proper interpretation of the 1905 Act, is totally ignored by the brief of the Commission. The agency gives absolutely no consideration to this important, if not controlling, provision of the Act. This failure is fatal to the Commission's attempted construction of the Act.

We hold that the Spokane River in 1905–10 was not a navigable waterway of the United States and that the Secretary of the Interior was authorized by the 1905 Act, which incorporated Washington water law by reference, to consent to and grant qualified applicants valid rights of way to construct dams on and to occupy the Spokane River at Little Falls, and to authorize the construction of the Little Falls development. Washington Power's Little Falls development therefore comes within the statutory exceptions set forth in sections 23(a) and 23(b) of the Federal Power Act, and the Company is *not* required, now that the River below Little Falls has become navigable, to obtain a license to continue to operate and maintain the development at Little Falls.

## I. BACKGROUND

Around 1905, David Wilson, a private entrepreneur responsible for much of the development of western Washington State, owned land on the south bank of the Spokane River at Little Falls, about 45 miles downstream from Spokane, Washington (J.A. 637–42). Wilson wanted to use the 83 foot drop in the river at that point (J.A. 637) to produce electricity and to do so needed to obtain an interest in the land on the north bank and in the bed and waters of the river itself. However, the north bank of the river and all land up to the high water mark on the south bank was within the Spokane Indian Reservation (the "Reservation"). Wilson could have obtained a permit from the Secretary of the Interior to use a right of way through the Reservation for a dam, etc., under the Act of February 15, 1901, 31 Stat. 790,[1] which applied generally to public lands and reservations. Such permit, however, would have been revocable at the discretion of the Secretary. *Id.* Moreover, it would not have included the right to the *use* of the river's water. *Id.* Unwilling to invest in building a power dam under these circumstances, Wilson enlisted the help of Representative Jones of Washington, the Congressman for the district, to sponsor a bill, which was enacted, "[p]roviding for the acquirement of water rights ... [and] land ... for sites for power purposes and the beneficial use of said water, and for other purposes." 33 Stat. 1006 (1905).[2] This bill applied only to the Spokane River along the

---

**1.** In addition to the powers granted by the Act of Mar. 3, 1905, the Secretary of the Interior also had the additional power granted by the Act of February 15, 1901, relating to rights of way through reservations, etc. This Act provided:

> That the Secretary of the Interior be, and hereby is, authorized and empowered, under general regulations to be fixed by him, to permit the use of rights of way through the ... reservations of the United States ... for electrical plants, poles, and lines for the generation and distribution of electrical power ... and for canals, ditches, pipes and pipelines, flumes, tunnels, or other water conduits, and for ... *dams,* and reservoirs used to promote [certain commercial activities] or any other beneficial uses to the extent of the ground occupied by ... electrical or other works permitted hereunder, ... by any citi-

zen, association or corporation of the United States, where it is intended by such to exercise the use permitted hereunder or any one or more of the purposes herein named: *Provided,* That such permits shall be allowed within or through any of said ... Indian, or other reservation only upon the approval of the chief officer of the Department under whose supervision such ... reservation falls and upon a finding by him that the same is not incompatible with the public interest ... *And provided further, That any permission given by the Secretary of the Interior under the provisions of this Act may be revoked by him or by his successor in his discretion, and shall not be held to confer any right, or easement, or interest in, to, or over any ... reservation....*

31 Stat. 790 (1901) (emphasis added).

**2.** The 1905 Act provides:

southern boundary of the Spokane Indian Reservation and became the 1905 Act. It empowered the Secretary of the Interior to *"consent"* to citizens, associations and corporations of the United States acquiring "the use of the waters of the Spokane River" along the southern boundary of the Spokane Indian Reservation. The "right" to the use of this water was to be acquired, under the procedure provided for by the Act, by *"appropriation* under and pursuant to the laws of the State of Washington." It also empowered the Secretary of Interior to grant such appropriators "land" within the Reservation "for the erection of suitable water, electrical, or power plants, *dams* ... and other needful structures required for the development of power or for the beneficial use of said water." *Id.* § 2 (emphasis added).

Immediately after Congress passed the 1905 Act, Wilson took the initial step to appropriate a flow of 10,000 cubic feet per second at Little Falls pursuant to and in accordance with the laws of Washington, and applied under the 1905 Act to the Secretary of Interior to acquire the right to use the waters of the Spokane River at the point of appropriation and to purchase 100 acres of the Reservation on the north bank of the river. The Secretary of the Interior, on November 3, 1906, acting in accordance with the 1905 Act, granted the 100 acres and the right to use the waters by approving Wilson's application (J.A. 261–81). This approval constituted the "1906 permit."

Less than a year later, on July 8, 1907, Wilson sold his interests in the lands and water rights to Washington Power (J.A. 298–322). In 1908, the Company began construction of the hydroelectric development.

The dam was constructed by the Company without complying with sections 9 and 10 of the Rivers and Harbors Act, 33 U.S.C. §§ 401 and 403, as would have been required if the Spokane River at that time and place was a "navigable river ... of the

*An Act Providing for the acquirement of water rights in the Spokane River along the southern boundary of the Spokane Indian Reservation, in the State of Washington, for the acquirement of lands on said reservation for sites for power purposes and the beneficial use of said water, and for other purposes.*

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the right to the use of the waters of the Spokane River where the said river forms the southern boundary of the Spokane Indian Reservation may, with the consent of the Secretary of the Interior, be acquired by any citizen, association, or corporation of the United States by appropriation under and pursuant to the laws of the State of Washington.

Sec. 2. That the Secretary of the Interior be, and he hereby is, authorized and empowered to grant such appropriator or appropriators land on said reservation, whether the same has been allotted in severalty to any individual Indians, but which has not been conveyed to the allottee with full power of alienation, or whether the same remains unallotted, on the north bank of the said Spokane River, such as shall be necessary and requisite for overflow rights and for the *erection* of suitable water, electrical, or power plants, *dams,* wing walls, flumes, or other needful structures required for the development of power or for the beneficial use of said water: *Provided,* That no lands shall be granted un-

der this Act until after the Secretary of the Interior is satisfied that the person, association, or company applying has made said application in good faith and *with intent and ability to use said lands for the purposes above specified* and that it requires the quantity of lands applied for in such use, and in case objection to the grant of said land shall be made, the said Secretary shall afford the parties so objecting a full opportunity to be heard.

Sec. 3. That the compensation to be paid for said land by said applicants shall be determined in manner prescribed in Section Three of the Act of March second, eighteen hundred and ninety nine, entitled "An Act to provide for the acquiring of rights of way by railroad companies through Indian Reservations, Indian lands, and Indian allotments, and for other purposes."

Sec. 4. That if the land allotted in severalty to any individual Indian which has not been conveyed to the allottee with full power of alienation be granted to any such appropriator, the Secretary of the Interior is empowered to use the moneys received for such land so allotted in the purchase of other suitable lands for such allottee.

Sec. 5. That the Secretary of the Interior shall make all needful rules and regulations not inconsistent herewith for the proper execution and carrying into effect of this Act. Pub.L. No. 173 ch. 1440, 33 Stat. 1006 (1905) (emphasis added).

United States ... or ... navigable ... wholly within [Washington]." [3] Washington Power also developed the Little Falls plant on the opposite side of the river from the site originally contemplated by Wilson, and so used some lands of the Reservation that were not included in the interests assigned to the Company by Wilson. Thus Washington Power itself appropriated a flow of 10,000 cubic feet per second pursuant to the laws of the State of Washington.

On May 18, 1908, Washington Power applied under the 1905 Act to the Secretary of the Interior to acquire the right to use the waters of the Spokane River at the point of its appropriation and to purchase an additional eight acres of Reservation lands at the same point (J.A. 328–409). On August 29, 1908, an Assistant Secretary of the Interior endorsed the initial approval of this acquisition by the Commissioner of Indian Affairs (J.A. 435). This constituted the "1908 permit." The original Wilson grant was also resurveyed by Captain Webster, United States Army, and others (J.A. 531–32), and approved by the Secretary of the Interior on May 6, 1910. The dam began producing electric power the same year.

The issue in this case is whether the present Commission correctly held, given the foregoing facts, that the present Federal Power Act, as enacted in 1920 and amended in 1935, requires Washington Power now to apply for and obtain a license in order to continue to operate and maintain the 1911 Little Falls hydroelectric development. We hold that under the exceptions contained in sections 23(a) and 23(b) of the Act, Washington Power is not required to apply for or to have any additional license or authority to continue to operate and maintain the existing Little Falls plant.

## II. THE STATUTORY FRAMEWORK AND THE LAW OF APPROPRIATION IN WASHINGTON

Sections 23(a) and 23(b) of the Federal Power Act, 16 U.S.C. §§ 816 and 817, provide:

Sec. 23(a) *The provisions of this Part shall not be construed as affecting any permit or valid existing right-of-way heretofore granted* or as confirming or otherwise affecting any claim, or as *affecting any authority* heretofore given pursuant to law ...

(41 Stat. 1075, 49 Stat. 846). Cf. 16 U.S.C. § 816 (emphasis added).

(b) It shall be unlawful for any person, state, or municipality, for the purpose of developing electric power, to construct, operate, or maintain any dam, water conduit, reservoir, power house, or other works incidental thereto across, along, or in any of the *navigable waters of the United States*, or upon any part of the public lands or reservations of the United States (including the Territories), or utilize the surplus water or water power from any Government dam, *except under and in accordance with the terms of a permit or valid existing right-of-*

---

**3.** The Rivers and Harbors Appropriation Act at the relevant time provided:

Sec. 9. That it shall not be lawful to construct or commence the construction of any bridge, dam, dike, or causeway over or in any port, roadstead, haven, harbor, canal, *navigable river, or other navigable water of the United States* until the consent of Congress to the building of such structures shall have been obtained and until the plans for the same shall have been submitted to and approved by the Chief of Engineers and by the Secretary of War: *Provided,* That such structures may be built under authority of the legislature of a State across rivers and other waterways the *navigable* portions of which lie *wholly within the limits of a single State,* provided the loca-

tion and plans thereof are submitted to and approved by the Chief of Engineers and by the Secretary of War before construction is commenced: *And provided further,* That when plans for any bridge or other structure have been approved by the Chief of Engineers and by the Secretary of War, it shall not be lawful to deviate from such plans either before or after completion of the structure unless the modification of said plans has previously been submitted to and received the approval of the Chief of Engineers and of the Secretary of War.
30 Stat. 1151 (emphasis added). As set forth below, we find that the Spokane River was not "navigable" within Washington.

*way granted prior to June 10, 1920,* or a license granted pursuant to this Act.... 16 U.S.C. § 817 (41 Stat. 1075, 49 Stat. 896) (emphasis added). The first question that must be addressed, is whether Washington Power prior to June 10, 1920, possessed a "valid existing right-of-way" to "operate, or maintain [a] dam" at Little Falls on the Spokane River. Since the critical language of the exception is in the disjunctive, it is not necessary to determine in addition whether the Secretary's action also constituted a *"permit"* to "construct [a] ... dam" (emphasis added).

■ It is clear from the language of the 1905 Act and from the contemporary laws of the State of Washington, which Congress incorporated by reference, that Washington Power had acquired a "valid existing right-of-way" to construct, operate, and maintain the Little Falls dam by the time it began producing electricity in 1910.

The 1905 Act provides:

That the right to the use of the waters of the Spokane River where the said River forms the southern boundary of the Spokane Indian Reservation may, with the consent of the Secretary of the Interior, be acquired by any citizen, association, or corporation of the United States *by appropriation under and pursuant to the laws of the State of Washington.*

Section 1, 33 Stat. 1006 (emphasis added). The 1905 Act sets out unambiguously Congress' intention as to the manner of acquiring the right to the use of these waters: *"by appropriation under and pursuant to the laws of the State of Washington." Id.* The 1905 Act thus incorporates by reference the state law of Washington as to the appropriation of water and makes it the congressionally mandated federal law governing the portion of the Spokane River bordering on the Spokane Indian Reservation. This was a completely sensible course for Congress to take.

Appropriation is a fundamental doctrine of water law in the western states. This doctrine developed in California in the first decade after the American conquest. Congress had failed to prescribe any legislative rules to govern water use on the public lands of these new federal territories, so miners without title based their use of water on the simple but effective doctrine of first come, first served. The common law of England, based on ownership of land and riparian use of streams, based on ownership of land and riparian use of streams, was generally ignored and another common law grew out of the customs and usages of the early American west, inspired principally by the paramount interest in mining precious minerals. The doctrine of appropriation, however, did not govern the water rights of Indian tribes and pueblos under federal law or the proprietary rights of the federal government. *See generally* 1 W. Hutchins, *Water Rights in the Nineteen Western States* 13–20 (1971). When Wilson wanted to appropriate the flow of the Spokane River by building a dam across it, therefore, the rights of the Spokane Indians and the federal government stood in the way.

This case thus becomes clearer if we first consider how Wilson would lawfully have proceeded under the laws of Washington, as Congress directed, had he chosen to appropriate water from a nonnavigable river on public land not within a federal Indian reservation. The procedure for appropriating water in effect in Washington when the 1905 Act was passed was established by the Act of 1891, passed by the Washington State Legislature in its second year of existence. 1891 Wash.Laws c. 142. The Act of 1891 provided that the right to the use of the water of streams, lakes, and certain other named surface sources for irrigation, mining, manufacturing, domestic, or municipal purposes could be acquired by appropriation. The 1891 procedure remained in effect until 1917, when another statute superseded it. While the 1891 Act did not provide specifically for appropriation for the production of electric power, the Washington Supreme Court ruled in 1908 that the statute did not provide the exclusive means of exercising the appropriative right. Rather, water rights could be

appropriated in the customary way, the statute only providing one means to prove and preserve the right. *Kendall v. Joyce,* 48 Wash. 489, 93 P. 1091 (1908).

The Washington Supreme Court, in one of its earliest water rights decisions, had already announced, moreover, the essentials of a valid appropriation of water. Appropriation, the court stated, comprises the intent to take water, accompanied by some open, physical demonstration thereof, for some valuable use, followed up with reasonable diligence and consummated without unnecessary delay. *Ellis v. Pomeroy Improvement Co.,* 1 Wash. 572, 21 P. 27 (1889). Construction of a dam for hydroelectricity unquestionably may satisfy these requirements for a valid appropriation. Thus if Wilson had built his dam and power plant on a nonnavigable stream flowing through public land in Washington, *not on a federal reservation,* he would have, leaving the rest of the facts of this case unchanged, acquired a valid interest in the waters of that stream through appropriation under Washington law. This legal system was well-established by 1905 and it is explicitly this body of law to which the 1905 Act referred.[4]

The existence of the *Spokane Indian Reservation* through whose lands flowed the Spokane River at Little Falls, however, obviously complicated the task of the would-be appropriator. In 1899, the United States Supreme Court ruled in *United States v. Rio Grande Dam & Irrigation Co.,* 174 U.S. 690, 702, 19 S.Ct. 770, 774, 43 L.Ed. 1136 (1899), that the federal government could reserve the use of water originating on or flowing through land owned by the federal government from appropriation under state law.[5] This rule was affirmed in *United States v. Winans,* 198 U.S. 371, 25 S.Ct. 662, 49 L.Ed. 1089 (1905), and in 1908, the landmark case of *Winters*

*v. United States,* 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340 (1908), followed this line of authority, and dealt specifically with the reservation against appropriation of water of a nonnavigable stream bordering the Fort Belknap Indian Reservation in Montana. In 1905, therefore, any appropriation at Little Falls under Washington state law would risk being trumped by the superior rights under the doctrine applicable to federal reservations. Any right arising from an attempt to appropriate water *solely* under Washington law from a stream flowing through a federal Indian reservation would have been precarious indeed.

Neither did statutory law provide much leeway to appropriators of water on Indian reservations. In the Act of February 15, 1901, 31 Stat. 790, previously referred to (see n. 1), Congress permitted the development of hydro-electric power on Federal reservations by authorizing the Secretary of Interior to permit the use of rights of way through public lands, forests, and other reservations of the United States, including Indian reservations, for electrical plants, poles, and lines for generation and distribution of electric power, as well as for "dams" used for any beneficial purpose. The 1901 Act, however, provided that any permission given by the Secretary of the Interior (the "Secretary") under the 1901 Act "may be revoked by [the Secretary] in his discretion, and shall not be held to confer any right or easement, or interest in, to, or over any public land, reservation, or park." *Id.*

The 1905 Act, however, is a *special act* that granted greater and different rights than the 1901 Act. That was its purpose. It specifically authorizes the Secretary to grant land on the Reservation to appropriators of water *under the laws of Washington* for the "erection of electrical, or power plants, dams for the development of

---

**4.** The subsequent Water Code of 1917 recognized "the existing rights of any riparian owner, [and] any existing right acquired by appropriation or otherwise." Laws of Washington 1917, ch. 117 § 1. Also, that "the use of water which has been applied to a beneficial use would be

and remain appurtenant to the land or place upon which the same is used." *Id.* § 39.

**5.** Since the Spokane Indian Reservation extended to the high water mark on the south bank of the River, the Tribe owned the river bed and the River flowed through the Reservation.

power or for the beneficial use of said water," 1905 Act, § 2, without conferring on the Secretary any right to revoke the right of way at will. The 1905 Act further adopts, *mutatis mutandis*, for the purposes of determining compensation, the Act of March 2, 1899, pertaining to *"rights-of-way* by railroad companies through Indian Reservations." 30 Stat. 990 (emphasis added).

■ The special Act of the 1905 Congress thus served several purposes. By providing that rights in the waters of the Spokane River bordering the Reservation could be acquired, with the consent of the Secretary, in accordance with the laws of the State of Washington, it cleared away any obstacle for hydroelectric development that may have existed under the federal reservation doctrine, which as we have seen, potentially conflicted with the state appropriation law. It provided, moreover, a means to compensate residents of the Reservation for any damage done to their property by the construction of dams and other works. And finally, it increased the incentive and ability to develop the water power of the Spokane River by obviating the Secretary's discretion to revoke at will hydroelectric rights of way that might be granted to that river along the southern boundary of the Reservation. Thus Congress clearly intended by the special Act to establish the framework by which hydroelectric developers could acquire the land on the banks, and the right to the use of the waters and the bed of the Spokane River to produce electricity.

This interpretation is confirmed by the language of the Act itself, its legislative history, and related statutory law. In the 1905 Act Congress authorized the Secretary of the Interior

to grant ... land on [the Spokane Indian Reservation] ... such as shall be necessary and requisite ... for the erection of suitable ... electrical, or power plants, [and] dams ... required for the development of power or for the beneficial use of said water [upon showing to the satis-

faction of the Secretary of Interior that the applicant had the] ... intent and ability to use said lands for the purposes above specified....

Act of Mar. 3, 1905, 33 Stat. 1006, § 2. The language of the Act clearly contemplates the grant of land by the Secretary for the specific purpose of constructing a dam, a reservoir and other works. The grant for that purpose implicitly confers on an approved applicant the right "to use said lands for [said] purpose"—otherwise the grant would be sterile and no federal law at that time prohibited such use. These grants constitute "rights-of-way" for the "erection of suitable ... electrical ... plants, dams, [etc.]" The Act also recognizes that the necessary water rights are to be "acquired ... by appropriation under the laws of Washington," provided that the applicant made the additional showing that he was able and intended "to use said lands for the [specified] purposes." Act of 1905, 33 Stat. 1006, § 2. All of this flows from the Act to be administered by the Secretary of the Interior.

Section 3 of the Act, moreover, clearly indicates that Congress intended the Act to authorize the granting of rights of way. That section provides that "the compensation to be paid for said land ... shall be determined in the manner prescribed ... in the Act of [March 2, 1899, which provided] ... for the acquiring of *rights-of-way* by railroad companies through Indian reservations...." *Id.* § 3 (emphasis added). The Act of March 2, 1899 (30 Stat. 990) provided for railroad companies to acquire "rights-of-way" for the purpose of constructing railroads through Indian reservation lands and for the payment of compensation for damage caused by the "construction" of railroads. 30 Stat. at 990–92. It would be mysterious indeed if Congress relied on a statute that provided compensation for damages caused by the "construction" of railroads as the model for a statute which, under FERC's attempted construction, did *not* authorize the "construction" of dams.[6]

---

6. The 1905 Act also parallels the 1899 Act in that

both permit the Secretary of Interior to autho-

For if Congress did not intend dams and other works to be constructed on the "rights-of-way" it provided for, there is no explanation for its including a specific provision for the payment of compensation for damages caused by construction. What other construction would there be? No compensatory damage would result merely from the acquisition of unused rights of way and water rights.

The correct reading of the 1905 Act, of course, avoids this enigmatic and unreasonable construction. Congress intended to provide for the granting of rights of way for the construction of dams and the statutory means to compensate parties for any damage done to them by such construction, just as Congress had provided for with respect to the construction of railroads. To construe the 1905 Act now, eighty years later, as not authorizing the construction of the dam, which was the single purpose Congress passed the Act and for which the Secretary granted the land and consented to the acquisition and use of the necessary water rights in the first place, would frustrate the clear intent of Congress expressed in the 1905 Act and the sole reason for its enactment. The erection of a dam or dams for hydroelectric development was the express purpose for which grants of rights of way were authorized by the 1905 Act, and Wilson and Washington Power both expressly requested authorization to exercise the right to construct a dam. *See infra* at 320–21. Indeed, as noted above, section 2 of the Act *required* an applicant to demonstrate the "intent and ability" to erect the necessary structures required for the development of power or for the beneficial use of the water before he could be granted or acquire any land or water rights.

## A. The Legislative History

 The FERC rejects this appeallingly straightforward interpretation of the statute and contends instead that the intent of Congress cannot be interpreted as authorizing the actual building of a dam. The Commission's only plausible support for this view is the colloquy on the House floor, set forth in the margin,[7] between

---

rize construction on Indian reservations only after the Secretary has ascertained that the applicant has the resources necessary to carry through with the project, a statutory requirement that would make no sense under FERC's interpretation.

7. Water Rights in Spokane River.

Mr. JONES of Washington. Mr. Speaker, I ask unanimous consent for the present consideration of the bill (H.R. 15609) providing for the acquirement of water rights in the Spokane River along the southern boundary of the Spokane Indian Reservation, in the State of Washington, for the acquirement of lands on said reservation for sites for power purposes and the beneficial use of said water, and for other purposes, which I send to the desk and ask to have read.

The Clerk read as follows:

*Be it enacted, etc.,* That the right to the use of the waters of the Spokane River where the said river forms the southern boundary of the Spokane Indian Reservation may be acquired by any citizen, association, or corporation of the United States by appropriation under and pursuant to the laws of the State of Washington.

Sec. 2. That the Secretary of the Interior be, and he hereby is, authorized and empowered to grant such appropriator or appropria-

tors land on said reservation, whether the same has been allotted in severalty to any individual Indians, but which has not been conveyed to the allottee with full power of alienation, or whether the same remains unallotted, on the north bank of the said Spokane River, such as shall be necessary and requisite for overflow rights and for the erection of suitable water, electrical, or power plants, dams, wing walls, flumes or other needful structures required for the development of power or for the beneficial use of said water: *Provided,* That no land shall be granted under this act until after the Secretary of the Interior is satisfied that the person, association, or company applying has made said application in good faith and with intent and ability to use said lands for the purposes above specified and that it requires the quantity of land applied for in such use, and in case objection to the grant of said land shall be made the said Secretary shall afford the parties so objecting a full opportunity to be heard.

Sec. 3. That the compensation to be paid for said land by said applicants shall be determined in the manner prescribed in section 3 of the act of March 2, 1899, entitled "An act to provide for the acquiring of rights of way by railroad companies through Indian reservations, Indian lands, and Indian allotments, and for other purposes."

Representative Jones of Washington, the author of the bill (H.R. 15609), and Representatives Dalzell and Lovering on February 11, 1905, the day the House passed the bill. The Act itself is sufficiently clear on its face so as not to require or authorize recourse to legislative history. *United States v. Oregon*, 366 U.S. 643, 648, 81 S.Ct. 1278, 1280, 6 L.Ed.2d 575 (1961); *Aviation Consumer Action Project v. Washburn*, 535 F.2d 101, 106 (D.C.Cir.1976). However, even the legislative history undergirds the view that the Act contemplated the construction of a dam, as careful examination of the colloquy between Congressmen Jones and Dalzell and Lovering reveals.

In this colloquy, Mr. Dalzell first inquired "How is the water power to be used, by dams in the river?' Mr. Jones of Washington replied:

They *will probably dam the river.* This is a matter they are willing to take care of at some future Time. I will say, however, that the War Department had the matter investigated, and I know from personal observation that that part of the

Sec. 4. That the Secretary of the Interior shall make all needful rules and regulations not inconsistent herewith for the proper execution and carrying into effect of this act.

The SPEAKER. Is there objection?

Mr. DALZELL. Mr. Speaker, reserving the right to object, I would like to have some explanation of this bill.

Mr. JONES of Washington. Mr. Speaker, the Spokane River forms the southern boundary of the Spokane Indian Reservation for a considerable extent. There is quite a fall in the river. There are considerable rapids there which would furnish splendid water-power facilities to the land on the north side. Being an Indian reservation there is no way by which sites for power purposes could be acquired. Our supreme court also has held that the riparian doctrine with reference to water holds in our State, and the question of the acquirement of water rights on the reservation is a matter of some doubt. This bill simply authorizes the acquirement of water rights on the reservation side of the river under the laws of the State of Washington, and the committee has put in a further restriction that it must be with the consent of the Secretary of the Interior. In order to secure sites for water-power purposes there is no law now under which the title to these sites can be secured. There is a law enabling companies to secure permits or licenses; but of course they would not want to expend large sums of money on a mere license or permit, so this bill authorizes the acquirement of title to this land under the procedure of law by which railroads can acquire rights of way through reservations. The money is to be paid to the Treasury for the benefit of the Indians, and the amendment suggested by the committee is that if any allotment is taken the sum received can be used by the Secretary of the Interior in the purchase of other suitable land for such allottee.

Mr. DALZELL. How is the water power to be used, by dams in the river?

Mr. JONES of Washington. They will probably dam the river. This is a matter they are willing to take care of at some future time. I will say, however, that the War Department had the matter investigated, and I know from personal observation that that part of the river is *not navigable.* This is simply a matter in reference to Indian lands, however, and the acquirement of water rights.

Mr. DALZELL. From what committee is this bill reported?

Mr. JONES of Washington. From the Committee on Indian Affairs. It simply affects Indian lands and provides means by which persons can acquire permanent rights.

Mr. LOVERING. Does it carry the right to dam the river?

Mr. JONES of Washington. Oh, no; not at all. That matter, if it came up, would have to go to the Committee on Interstate and Foreign Commerce. They have to take their chances on that.

The SPEAKER. Is there objection? [After a pause.] The Chair hears none.

Mr. JONES of Washington. Now, Mr. Speaker, in the amendment as section 4 the word "appropriation" should be "appropriator," and I will move the amendment.

The SPEAKER. The Clerk will report the amendment.

The Clerk read as follows:

Amend the amendment as section 4 by striking out the word "appropriation" and insert the word "appropriator."

Mr. STEPHENS of Texas. Do you accept the committee amendment?

Mr. JONES of Washington. Yes.

The question was taken on the amendment to the amendment, and it was agreed to.

The SPEAKER. The question now is on agreeing to the committee amendment.

The question was taken, and the amendment was agreed to.

The bill as amended was ordered to the engrossed and read a third time; and was read the third time, and passed.

On motion of Mr. JONES of Washington, a motion to reconsider the last vote was laid on the table.

39 Cong.Rec. 2413 (1905) (emphasis added).

river is *not navigable.* This is simply a matter in reference to Indian lands, however, and the acquirement of water rights.

39 Cong.Rec. 2413 (1905) (emphasis added). From the foregoing exchange, it is clear that Jones plainly told Congress that erecting a "dam [in] the river" was more than a possibility, it was a *probability* that "they [Wilson and later the company] are willing to take care of at some future time." In making this representation to Congress, Representative Jones gave the House (and us) the underlying explanation why the Bill took the form it did. He stated categorically that "the War Department had the matter [navigability] investigated and [Rep. Jones] knew from personal observation that that part of the [Spokane] river is *not* navigable" (emphasis added). Had the river been navigable, the consent of the Secretary of Interior would probably not have been sufficient since the Rivers and Harbors Appropriation Act of 1899 required the consent of Congress and the Army Corps of Engineers before a party could lawfully obstruct a *navigable* stream with a dam. Since the river was not navigable, however, as we discuss below, the consent of Congress and other requirements of the Rivers and Harbors Act were not applicable.

Representative Jones then stated to Congress that the bill "simply affects Indian lands and provides means by which persons can acquire the *permanent rights*" *See* note 7 *supra* (emphasis added). This expression of congressional intent indicates that the interests in the lands that would be granted by the Secretary of the Interior to erect dams, acquire water rights, etc., pursuant to this special Act of March 3, 1905, would be "permanent" rights so long as they were used for the purposes Congress empowered the Secretary to approve. The Reservation lands ran to the high water mark on the south side of the River and thus the grant included the river bed sufficient to erect the needed dam, since the applicants already owned the contiguous land on the south bank necessary for the dam.

The colloquy then continued to the point where Jones made the remark upon which the Commission relies so heavily:

Mr. Lovering. Does [the bill] carry the right to dam the river?

Mr. Jones of Washington. Oh, no; not at all. That matter, if it came up, would have to go to the Committee on Interstate and Foreign Commerce. They have to take their chances on that.

*Id.* The FERC contends this exchange demonstrates that "the 1905 Act dealt with the granting of water and land rights, not the authority to build a dam." Brief of FERC at 16. This position ultimately leads the FERC to conclude that Washington Power was without authority to erect the dam in 1908–10 and that it has operated the dam for over 70 years without valid authority. This construction of Congressman Jones' remark is, however, too broad. It ignores the earlier statement by the bill's author that "[t]hey will probably dam the river." It also ignores the plain language of the Act. The reconciliation of these two statements, that "they will probably dam the River" and that the bill does not carry the right to dam the river is in fact, however, not difficult.

We may begin with the unambiguous statement that Wilson and company *"will probably dam the river"* and that "they are willing to take care of [that matter] at some future time." Congressman Jones obviously took the inquiry of Congressman Lovering to be an inquiry directed to Committee jurisdiction. His reply to the inquiry whether "the bill [carried] the right to dam the river," was directed to whether the terms of the bill required it to be considered by the Committee on Interstate and Foreign Commerce which had jurisdiction over legislation involving *navigable* waters of the United States. Thus Congressman Jones' reply was indicating that the bill authorized "the acquirement of water rights" for which "[t]hey will probably dam the river," and that they could do this because "that part of the river is not navigable." However, if in the future the

"matter [of building a dam in navigable waters] came up [it] would have to go to the Committee on Interstate and Foreign Commerce." This interpretation reconciles both Congressman Jones' remarks and explains his reply in terms related to the jurisdiction of the Committee on Interstate and Foreign Commerce. Congressman Lovering of Massachusetts, the second member who inquired concerning the right to dam the river, was one of the more senior members of that Committee. 1905 *Congressional Directory* 182.

Congressman Dalzell, who questioned Congressman Jones as to whether the river would be dammed and from what committee the bill was reported, was a member of the Rules Committee. He was undoubtedly concerned with whether the bill was proper for consideration on the unanimous consent calendar as well as whether the House committee with appropriate jurisdiction over the damming of navigable rivers had reported the bill. The bill had been reported out by the Committee on Indian Affairs and was being considered on the unanimous consent calendar. If the river was navigable, the Committee on Interstate and Foreign Commerce would have had jurisdiction; then Congressmen Dalzell and Lovering would have realized the bill had not come from the correct committee, and either could have stopped it by a single objection.

There was, moreover, a chance that in the future the "matter" of damming a navigable river would come up, since at the time the bill was being considered, an officer of the Army Corps of Engineers was conducting a navigability study of the river (J.A. 623). While Congressman Jones was confident from personal observation, and his stated knowledge of the War Department investigation (39 Cong.Rec. 3413), that the river was not navigable, if the study determined it was, the Committee of Interstate and Foreign Commerce would have had to approve legislation authorizing obstruction of the stream. The river was not navigable, however, and the matter did not come up.

The House therefore passed the bill on Congressman Jones' representation, based on the War Department's investigation and his personal observation, that the river was not navigable. The bill was passed by the House on February 11, 1905, 39 Cong.Rec. 2713, and 20 days later on March 2, 1905 by the Senate. 39 Cong.Rec. 3847. There was ample time after the House passed the bill and before the Senate passed it for the War Department to intervene and correct any inaccurate assessment of the River's navigability. The fact that neither the War Department nor any other party attempted to stop this bill by claiming the river was in fact navigable, is strong evidence that no one in authority doubted that the river was *not* navigable. Since the bill passed both houses on the unanimous consent calendar, a single objection could have stopped the bill. *Id.* It should also be noted that the Army engineer advised, subsequently by letter of March 20, 1905 to the Army District Engineer at Portland, Oregon, that "the Spokane River is only navigable to Post Falls" (J.A. 623). Had the Army found the River to be navigable it could easily have stopped the Little Falls Development. The evidentiary record, however, demonstrates that the Army Engineers were cognizant of the development being implemented by the 1905 Act, they investigated the matter and saw no basis for the exercise of their jurisdiction over any "navigable" water. *Id.*

■ Congressman Jones was, in addition, correct in stating that the bill did not give any particular person the right to dam the river. The bill did not carry the *complete* right to dam the river, although the Act went as far in that direction as it could with respect to a river that was *not* a navigable river of the United States, unless Congress wanted to make established Washington water law inapplicable. Complete authority to dam the river, under the 1905 Act, was to be derived from satisfying the requirements of *both* federal and state law under the terms of the 1905 Act. Congress could grant the *land* including the stream bed upon which to erect the dam,

but that was only part of the authority that was needed. It was still necessary under the Act for the Secretary to consent and for the appropriator to obtain the right to use the waters of the Spokane River *"by appropriation* under and pursuant to the laws of the State of Washington" (emphasis added). Under the Washington statute, appropriation of water rights was not limited to any particular method. 1891 Wash. Laws ch. 142, § 1. Therefore it was permissible, in the absence of any controlling prohibition, to appropriate water by diversion, as Wilson intended, to be accomplished by a dam. His application to the Secretary of the Interior stated that the diverted water would be used, *inter alia,* for a power house, lighting plant and irrigation system (J.A. 267–68). Obviously any diversionary method would satisfy the statute. Thus the laws of Washington in effect in 1908–10, authorized *any* citizen or corporation of the United States that desired to appropriate unappropriated water in a *non-navigable* stream to do so by the erection of a dam, provided he had the necessary consent and rights in the river bed and in any land that might be overflowed. *Griffith v. Holman,* 23 Wash. 347, 63 P. 239, 243 (1900) (the riparian owner has the right to obstruct a *non-navigable* river). Therefore, when the Secretary made the grant of the right of way in the land, and consented to the acquisition of the right to *use* the water by the erection of the dam, he authorized the construction of the dam in accordance with the intendment of the Act. No federal or state statute or decisional law, at that time, required a more specific "permit" to build a dam to divert nonnavigable waters under such factual circumstances. The principal objective obstacle here for Wilson was to acquire a sufficient right of way interest in the land constituting the river bed, and the appurtenant riparian and other rights of the Spokane Indian Tribe and the United States, to erect a dam. The 1905 Act provided for the attainment of all such objectives by authorizing the Secretary to "consent" to the acquisition of water rights by Wilson and Washington Power and to "grant" them, as appropriators, the necessary rights of way.

Thus, when Representative Jones replied to Representative Lovering's inquiry as to their "right to dam the river" that "[t]hey have to take their chances on that," he was in fact giving a plain description of the legal procedure that the applicants had to go through to secure their complete right to dam the river under the terms of the 1905 Act. Not only did the pending 1905 navigability study raise a potential uncertainty; there were uncertainties inherent in the legal procedure of appropriation. The "chances" Wilson had to take included the possibility that others might precede him in appropriating the water and thus under Washington appropriation law, 1891 Wash. Laws, ch. 142, § 1, be "first in time [and] the first in right" with respect to the water rights.

Speed in appropriation therefore was essential if Wilson was to be successful in making good the chances that were available to him. Realizing all this, Wilson acted quickly. The Congressional Bill was signed by the President on March 3, 1905, in Washington, D.C. On March 8, 1905, "on a scrubby pine tree" over 3,000 miles away, Wilson posted his Location of Water Right "opposite to the head of what is known as the Little Falls of the Spokane River" (J.A. 178). And promptly at 8 o'clock the next morning, the 9th day of March, 1905, Wilson filed for record a copy of this "Water Right" with the County Auditor of Lincoln County (J.A. 178). That Wilson acted with such promptness indicates that he was clearly aware he had to be the first in acquiring his water right if he were to secure the right to dam the river. This procedure of posting and filing was sufficient under Washington law to *initiate* the appropriation of "10,000 cubic feet per second of the flow of water in the Spokane River" at the approximate point of posting, i.e., at the Little Falls.

It is not necessary to outline further the timing of the subsequent steps that led to the construction of the dam and

the related power plant that perfected the Company's appropriation. It is only essential to realize that, following the enactment of the 1905 Act, it was the consent and approval of the Secretary *and* compliance with the laws of Washington and the rights Wilson acquired by compliance with *both* laws that gave Wilson the final right to excavate and construct the dam to store and divert the waters of the Spokane River at Little Falls. Since the river was *not navigable*, it was, after the 1905 Act, the Secretary's approval *and* Washington law that provided the means both necessary and sufficient to perfect the right to construct the works at Little Falls. The final act perfecting the "appropriation" of the water was the erection of the dam and the *diversion* of the water to "use" in the electrical power plant. This or some other eventual "use" was essential under Washington law, as incorporated into the 1905 Act, or else the water right would be lost. Moreover, water appropriated for one purpose could be changed "to any other beneficial use." *Id.*, § 9.

### III. THE INTERPRETATION OF THE 1905 ACT BY THE SECRETARY OF THE INTERIOR

The belated construction of the 1905 Act that the Commission now advances for the first time is also clearly at odds with the contemporaneous and subsequently continuous interpretation by the Department of Interior, which was charged with administering the 1905 Act. 1905 Act, § 2. The express terms of the 1905 Act are on their face quite clear: They show that Congress intended the Spokane River on the southern border of the Reservation to be developed to produce electricity, i.e., "for sites for power purposes ... erection of ... electrical or power plants ... development of power." *Id.* In addition, the contemporaneous interpretation of the 1905 Act by the Department of the Interior provides additional support for the interpretation of the statute presented above.

In his letter of May 4, 1906, to the Commissioner of Indian Affairs, Secretary of the Interior E.A. Hitchcock wrote:

Sir:

I have considered your communication of the 4th ultimo, submitting the papers in the matter of the application of David Wilson, of Spokane, Washington, for the right to *use* the waters of the Spokane River, and for the acquirements of land on the Spokane Indian Reservation, for sites for power purposes and other beneficial use of the waters of said river.

By Department letter of November 11, 1905, the Department returned Mr. Wilson's application, with accompanying papers, and advised you that the same would be further considered when amended so as to conform to Department regulations prescribed under the Act of March 3, 1905.

With your said letter of the 4th ultimo you submit an amended application filed by Mr. Wilson under date of January 24, 1906, to conform to the regulations referred to, particularly describing the land desired to be acquired and purchased; and *applying also for the right to erect and maintain any and all suitable water, electrical or power plants, etc., required for the development of power for the beneficial use of the waters of the Spokane River; also for the right to build a dam at the points designated on the map accompanying the said application, and marked "site for dam No. 1," and "site for dam No. 2," reserving to himself the right to hereafter determine at which of said two sites he will erect the dam.* The applicant sets forth that he is seeking to acquire the land and water rights in good faith, for the purpose of making certain improvements and developing power, as soon as the rights sought shall be obtained, and the state of the water will, permit; said improvements to consist of a *dam*, power house, flumes, penstock, turbines, electrical generators, transformers, and the necessary pole line to market said power, and *all the other requisites to the construction and establishment of a modern electrical power and lighting plant* . . . .

. . . . .

From a careful examination of all the papers submitted, it appears that the amended application of David Wilson is in accordance with the requirements of the Department, as set forth in the regulations approved October 3, 1905, prescribed under the Act of March 3, 1905; that he has submitted satisfactory showings as to his financial business and executive ability, and that he actually intends to develop and use the power at the site and for the purposes specified.

In view of all the facts shown in the papers, therefore, and in accordance with your recommendation, *the said application of David Wilson is approved....* (J.A. 230–32) (emphasis added). The italicized language above places it beyond doubt that the Secretary of the Interior interpreted the Act to authorize him to "consent" to Wilson's application to use the waters, to grant him "the land and water rights" on the Spokane River Indian Reservation, to confer on Wilson "the right to erect and maintain" whatever facilities were necessary to develop the river for hydroelectricity, "to build a dam" and other improvements necessary to produce and transmit electricity and to *approve* Wilson's application for all the foregoing purposes. *Id.* It is also clear that the Secretary determined Wilson's application con-

formed to the requirements of the applicable regulations and that Wilson had applied in conformance with said regulations for authority to build a hydroelectric dam. The contemporaneous regulations promulgated by the Department of the Interior, Office of Indian Affairs, on September 28, 1905 in every paragraph breathe their interpretation of the 1905 Act as authorizing the construction of power dams, etc., and as imposing the obligation on the Department of the Interior to pass upon applications therefor and to approve those that comply with the Act and the regulations.[8] The Secretary approved Wilson's application and in so doing interpreted the 1905 Act as conferring on the Secretary the authority to make such grants. While Wilson's right of way was later amended upon application by the Company to include additional land necessary for the facility, nothing subsequently occurred to cast doubt on the Secretary's clear approval of Wilson's application to develop the river, which explicitly included, *inter alia,* the right to build, operate, and maintain a dam.

*It is clear to this division of the court that the Act authorized the Company to acquire all the necessary "right of way," and that dual compliance with the 1905 Act and the laws of the state of Washington, as embodied in the 1905 Act, au-*

8. The September 28, 1905 Regulations provided that no applicant could "acquire any rights to the *use* of the waters of the said Spokane River, or to the *use* of the lands in the said Spokane Indian Reservation, under the provisions of this Act, until application therefor [and approval] by the Secretary of the Interior." (Section 2). To obtain such rights applications were required "to describe ... *the area of overflow lands involved* and the extent and dimensions of the *site for proposed works,* and ... such other material facts as to *the possibilities of the development of power* as will furnish data upon which to base an estimate of the value of the rights sought to be acquired." (Section 3).

"Seventh. A map ... showing the location and extent of ... *overflow lands* and sites proposed to be occupied by buildings or other *structures* necessary to be used in connection with the *proposed works and showing in detail the proposed elevation of waters to be contained or controlled....* Eighth. Evidence of the compliance ... with the laws of the State of Washington concerning the *acquirement* of water

rights.... Ninth. A statement of the approximate amount of water flowing in the Spokane River *at the point of diversion or appropriation* .... Tenth. Satisfactory evidence of the good faith of the company and its financial ability in the matter of the *construction of the proposed works." Id.*

"4. Upon the approval of an application ... the Indian Service will be designated to *appraise the damages,* tribal and individual, arising by reason of the taking of lands and of *the location and proposed construction of the works....*

"5. No work of construction of any character will be permitted until compensation for the lands to be taken and *damages* done or to be done shall have been determined and paid in manner as herein provided.

"6. The foregoing regulations shall be observed ... by any individual seeking to acquire the rights authorized under the provisions of this act, and particularly as to the purpose, intent, and *financial ability of the applicant."* (J.A. 941–46).

*thorized the Company to dam the non-navigable waters of the Spokane River and thereby appropriate the beneficial use of its waters for power purposes.*

■ It is not clear from the record whether the dam ultimately constructed, maintained, and operated by Washington Power occupied either one of the two precise locations for dams on the Spokane River indicated on the map approved October 3, 1905, by the Secretary. *Compare* Exhibit 81 *with* Exhibit 116 (by comparing the maps showing the location of the present dam with that showing the approved sites it is impossible to tell whether the dam was built exactly on approved sites Nos. 1 or 2).[9] Even if the dam Washington Power ultimately built, however, was not precisely at Dam Site No. 1 or No. 2, as marked on Exhibit 81, the land and other rights granted by the Secretary to Wilson would still be valid as to the existing dam and other structures at Little Falls. Wilson applied to the Secretary for the right not only to build dams at the marked sites, but

> [a]lso the right to erect and maintain any and all suitable water, electrical or power plants, dams, wing-walls, flumes and other needful structures required for the development of power for the diversion of water for irrigation and other beneficial use of said water ...

(J.A. 500). Thus the approval of the application was broad enough to include the dam notwithstanding any minor deviation from the marked sites. The Acting Commissioner of Indian Affairs in his letter of transmittal accompanying Wilson's application also reemphasized to the Secretary that Wilson was applying for the right to build a dam (J.A. 506).[10] The Commission's present ruling that the 1905 Act did not authorize the Secretary to authorize the building of dams thus bluntly contradicts the contemporaneous interpretation of the Act by the Secretary and the Commissioner of Indian Affairs.

The Commission's present ruling that the 1905 Act did not authorize Wilson or his successors to "occupy" the River is equally inconsistent with the Secretary's contemporaneous interpretation. To the contrary, the Department of the Interior had approved Wilson's application "to *occupy* and improve said waters and the land necessarily incident thereto" (J.A. 180) (emphasis added). *Washington Water Power Company* 25 F.E.R.C. ¶¶ 61,002, 61,0027 (1983) (Butler, Chrmn., dissenting).

Wilson subsequently transferred all his water rights, which included the rights to build and maintain dams and other structures, to Washington Power.[11] The Commission would not have been able to reach the issue not passed upon by the ALJ, namely whether the 1905 Act granted the authority to build the Little Falls Dam at all, had it not held the transfer was valid. *See* Brief of Respondent at 8. The Commission has thus conceded that the transfer was valid.[12] This transfer may be viewed

9. The two sites were within 700 feet of each other and it is clear that the dam was erected at the approximate location that had been approved.

10. [Wilson] prays further for the right to erect and maintain any and all suitable water, electrical or power plants, dams, wing-walls, flumes and other needful structures required for the development of power, for the diversion of water for irrigation and other beneficial use of said water, and to dam and back up the said water by building a dam at the point designated on the map "dam", giving, as alleged, approximately, one hundred feed [sic] head.
(J.A. 506).

·11. See Exhibits 28–30 (J.A. 298–322), 45 (J.A. 422–427), 49 (J.A. 431–436), 54 (J.A. 444–445),

59 (J.A. 466–524), 62 (J.A. 527–529), 73 (J.A. 534–535) for full documentation of the transfer of rights from Wilson to Washington Water Power.

12. The reasoning the Commission applied in approving this transfer was correct, even if it exceeded its authority in reviewing a transfer that had already been approved by the Department of Interior, the agency in charge of approving such transfers under the 1905 Act.

This transfer included the transfer of the right to operate and maintain a dam, which was explicitly part of the Wilson's 1906 approved application. Moreover, sections 23(a) and 23(b) expressly prohibit the Commission from "affecting" the transferable "right of way" held by Washington Power by unlawfully rendering it

as having been approved by the Secretary and, as the Commission notes, the Company "informed the Secretary ... of the transfer and did everything necessary to obtain a permit for itself." Indeed, the 1905 Act in section 4 gives the Secretary broad authority to enforce the Act. This includes the authority to regulate any transfers of rights granted by the Secretary under the 1905 Act.

 In passing on Wilson's application it was necessary for the Department of the Interior to interpret the 1905 Act and it is clear that the Secretary interpreted that Act alone as permitting the granting of the rights to use water and land, to approve the building of the dam on non-navigable waters, and to transfer these rights. The agency empowered to administer the 1905 Act thus made a contemporaneous interpretation of the Act to which the Commission should have deferred. It is well-settled that "the interpretation of an agency charged with the administration of a statute is entitled to substantial deference." *Blum v. Bacon*, 457 U.S. 132, 141, 102 S.Ct. 2355, 2361, 72 L.Ed.2d 728 (1982), *quoted in Aluminum Company of America v. Central Lincoln Peoples' Utility District*, 467 U.S. 380, 104 S.Ct. 2472, 81 L.Ed.2d 301 (1984); *Chevron U.S.A. v. Natural Resource Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). This doctrine of deference is particularly sound law in this case. The Department of the Interior, which interpreted and administered the 1905 Act, had longstanding experience in administering similar statutes, as was later demonstrated by the opinion of the Secretary of the Interior expressed in the May 10, 1923 reconsideration of the May 1, 1923 patent issued to Big Bend Transit Company (J.A. 538–45). *See also United States v. Big Bend Transit Co.*, 42 F.Supp. 459 (E.D.Wash.1941). In this opinion by the Secretary he interpreted the 1905 Act as a right of way statute for the construction and operation of a hydro-

electric dam and related facilities on the right of way granted at Little Falls and to regulate the transfer of such rights. Since the Little Falls Development had been completed at that time, his opinion confirms our foregoing analysis that the 1905 Act authorized the Secretary to confer such rights and to authorize such construction. Such interpretation is supported by the plain language of the 1905 Act itself.

The contemporaneous interpretation of the Department of the Interior is all the more to be deferred to in a case like this, where the statute and its interpretation by the Agency is almost eighty years old. Present day constructions of an old statute are likely to be inaccurate for the obvious reason that the older a statute is, the more difficult is the task of reconstructing the Congressional intent. It is not for the Commission, eighty years later, to attempt now to critique the niceties of how the Secretary of the Interior, in his discretion, fulfilled the mandate of the 1905 Act while it was still fresh in minds of the Congressmen who passed it and agency officials who were designated to enforce it and similar statutes. As Mr. Justice Cardozo observed,

> [Administrative] practice has peculiar weight when it involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new.

*Norwegian Nitrogen Co. v. United States*, 288 U.S. 294, 315, 53 S.Ct. 350, 358, 77 L.Ed. 796 (1933) (citation omitted). *See EEOC v. Associated Dry Goods Corp.*, 449 U.S. 590, 600 n. 17, 101 S.Ct. 817, 823 n. 17, 66 L.Ed.2d 762 (1981); *Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 210, 93 S.Ct. 364, 367, 34 L.Ed.2d 415 (1972); *Power Reactor Co. v. Electricians*, 367 U.S. 396, 408, 81 S.Ct. 1529, 1539, 6 L.Ed.2d 924 (1961). Indeed, the construction the

---

non-transferable. The actions of the Secretary of Interior have already conclusively demonstrated that the rights held under the 1905 Act are transferable. It is therefore absolutely clear

that the Department of Interior held that it could issue to Wilson a right of way to build and maintain a dam at Little Falls, and that such right was transferable.

Commission presently attempts to blithely circumvent the clear intent of the 1905 Act, is itself strong evidence of the dangers of reinterpreting statutes, so long after they have been enacted, interpreted, and relied upon by private parties and agencies alike.

## IV. The Application of the Federal Power Act

█ It is of the utmost importance to realize that the rights of the Washington Water Power Company in this case are based on a *special* Act, and that a special act prevails in effect over more general acts. *Brown v. GSA*, 425 U.S. 820, 834–35, 96 S.Ct. 1961, 1968–69, 48 L.Ed.2d 402 (1976); *Morton v. Mancari*, 417 U.S. 535, 550–51, 94 S.Ct. 2474, 2482–83, 41 L.Ed.2d 290 (1974) (citing cases); *Preiser v. Rodriguez*, 411 U.S. 475, 489–90, 93 S.Ct. 1827, 1836, 36 L.Ed.2d 439 (1973); *Fourco Glass Co. v. Transmirra Corp.*, 353 U.S. 222, 228–29, 77 S.Ct. 787, 791–92, 1 L.Ed.2d 786 (1957); *Townsend v. Little*, 109 U.S. 504, 512, 3 S.Ct. 357, 362, 27 L.Ed.2d 12 (1883); 2A C. Sands, *Sutherland Statutory Construction* § 51.05 (4th ed. 1984). In fact, the 1905 Act is a very "special act" being limited solely as it is to the relatively small area of the Spokane River on the southern boundary of the Spokane Indian Reservation. A construction of the more general Federal Power Act, or the Rivers and Harbors Act which had the effect of rendering the special 1905 Act void would thus be highly suspect. Having settled that the 1905 Act authorized the Secretary to grant parties the necessary rights of way and approval to build, maintain, and operate the Little Falls facility, "in the Spokane River along the southern boundary of the Spokane Indian Reservation," *see* n. 2, the central question of this case becomes whether these rights fall within the exception recognized and granted in sections 23(a) and 23(b) of the Federal Power Act. FPA, 16 U.S.C. §§ 816 and 817.

Clearly, the right to maintain and operate the Little Falls development is based on a "valid existing right-of-way [previously] granted" that falls within these exceptions. The Department of the Interior interpreted the 1905 Act when that agency reconsidered Washington Power's application for a patent. Having compared the Act of February 15, 1901, 31 Stat. 790, to the 1905 Act which authorized the granting of permanent rights of way, etc., Secretary Hubert Work wrote:

The fundamental differences, then, between the two acts, are that whereas, by the act of 1901 the right conferred is that of a *mere permit*, revocable by the Secretary of the Interior, under the Act of 1905 (in all respects similar to the act of March 3, 1891, 26 Stat. 1905, in the matter of the extent and nature of the grant, and jurisdiction to terminate the same), such right is a limited fee on an implied condition of reverter in the event the grantee ceases to use or retain the land for the purposes indicated in said act of 1905, *supra*, the termination of which *right of way* or limited fee is not vested in the Secretary of the Interior, but may be effected, upon good cause being shown, only through proceedings had without the jurisdiction of the Department of the Interior, see, in this connection, Kern River Company *v.* United States (257 U.S. 147 [42 S.Ct. 60, 66 L.Ed. 175]). *In other words, both the acts of 1901 and 1905 are right of way acts; the former general in its nature and application, the latter special in its nature and application.*

(J.A. 542) (emphasis added). Thus it is clear that the Department interpreted the 1905 legislation as a special Act authorizing the establishment of valid *"rights of way"* which included authorization to "consent" to the building and maintenance of a hydroelectric dam, which was granted well before June 10, 1920.[13] It is significant

---

**13.** The above quotation is merely one of many that could be cited to the same effect. In fact, the record is so replete with references to "dams," "power sites," "construction" and so on that it is absolutely clear that the Department of

the Interior, the Commissioner of Indian Affairs, the Indian Agents in the field and all other parties involved in the enforcement of the 1905 Act understood it to authorize the construction, operation and maintenance of a power dam and

that this opinion of the Department rendered on May 10, 1923, is a contemporaneous interpretation of the Federal Water Power Act of 1920 and its application to rights granted under the 1905 Act.

The Commission, however, now proposes a different analysis of the 1905 Act and its relation to sections 23(a) and 23(b) of the Federal Power Act. FERC first states part of the legislative history of sections 23(a) and 23(b): Those sections of the bill as originally introduced provided for *"revoking* any permit or valid existing right of way heretofore granted or as *revoking* any authority heretofore given pursuant to law" instead of prohibiting their being construed "as *affecting* any permit or valid existing right of way ... or ... authority" (emphasis added). On June 25, 1919, Gifford Pinchot, revered as one of the fathers of the conservation movement, suggested changing "revoking" to "affecting" in order to make it clear that *revokable* permits (like that created by the 1901 Act from which the 1905 Act departed) would not become irrevocable by virtue of the passage of Federal Water Power Act of 1920, 41 Stat. 1075 (1920) ("FWPA"). The Commission now states in its current Opinion No. 117A that the language of section 23(a) was intended neither to diminish nor enlarge rights held under pre-FWPA permits. 25 F.E.R.C. ¶ 61,002 at 61,014. Thus, FERC rules in its current Opinion No. 117 that Washington Power could continue to occupy lands of the Spokane Indian Reservation and utilize waters of the Spokane River for the Little Falls development, but could not continue to operate and maintain its dam without a license under section 23(b). In the Commission's view, this would be an "enlargement" of the original 1906 and 1908 permits. This result, the Commission contends, "strikes a balance between preserving the authority of the pre-FWPA permits, and refraining from enlarging that authority;" it contends, that is, that to uphold the Company's position

would enlarge the right of way granted under the 1905 Act to construct and operate the dam. In fact, the Commission's argument refuses to recognize the full "right of way" authorized by the statute, which was granted and consented to by the Secretary, and then balances its misconstruction against a result which assumes the validity of its misconstruction. All the emphasis on "enlargement," etc., in reality is an attempt to impose a standard different from the statutory standard. The statute expressly prohibits the Commission from doing anything that could be construed as "affecting any authority" or "existing right-of-way." When that standard is applied, the Commission's construction clearly falls.

The Commission's position is that the right of way is separate from the right to *use* it. This is an incongruous outcome, since under the 1905 Act, and the laws of Washington providing for the appropriation of water rights that the 1905 Act incorporates, the right to the *beneficial use* of the water implicitly follows from the acquirement of the water rights and the land. The rights in the land were acquired by "grant" from the Secretary and the water rights were acquired by appropriation under the laws of *Washington* with the "consent" of the Secretary. The title of the Act indicates that its purpose is to provide for "the acquirement of water rights [and] lands ... for sites for power purposes, *and the beneficial use of said water."* The three go hand in hand. In keeping with the title, the first section of the 1905 Act provides: "The right to the *use* of the waters of the Spokane River ... may with the consent of the Secretary ... be acquired ... by appropriation under ... the laws of ... Washington." The statute then continues: "the Secretary ... is authorized and empowered to *grant* such appropriator [of the water rights in the Spokane River] ... *land* ... such as shall be necessary ... for the erection ... [of] dams [etc.] required for

---

other structures necessary to produce power. These documents are set forth as *Appendix Document No. 9 to the Reply Brief of the Petitioners,* and constitute overwhelming evidence that all

the federal officials responsible for administering the 1905 Act construed it to authorize the construction, operation and maintenance of a dam.

the development of power or *for the beneficial use of said water....*" *Id.* § 2. "[T]he right to the *use* of the waters of the Spokane River" as provided for in the first section of the Act, is just another way of recognizing that the appropriator may *beneficially use* his water rights by "the erection ... [of] dams ... for the development of power." *Id....* As a practical matter, in the context of the statute, water rights and land, appropriated, consented to and granted "for the development of power," could not be *used* in any way other than by a dam.

The effect of the Commission's ruling would be to strip Washington Power of its *valid* right of way to operate and maintain the dam at Little Falls, and in effect to revoke that right. However, the applicable statutes the Commission relies upon recognize the continuing validity of any "valid existing right-of-way", FPA § 23(b), and provide that they "shall not be construed as *affecting* any permit or valid existing right of way ... granted prior to June 10, 1920 ... or as *affecting* any authority heretofore given pursuant to law." FPA § 23(a), 16 U.S.C. § 816 (emphasis added). For the Commission to require now, some 75 years after the completion of construction, that the Little Falls dam be licensed so that Washington Power may continue the "beneficial use" of its water rights acquired by appropriation in 1906–10, clearly would "affect" the existing right of way in a very concrete way: It would deny Washington Power the right to the beneficial use of the waters diverted by the dam without further license. It would also drastically reduce the value of all the real property involved. The license the present Commission seeks to require Washington Power to acquire to operate and maintain the Little Falls facility would, if granted, expire after fifty years. Upon this expiration, the Little Falls development could be appropriated by the United States or transferred to some other party. Washington Power would need to be compensated in this event only according to the "net investment formula" which may well be much less than the market value of the transfer-

able limited fee currently held by the Company.

▮ Thus the Commission proposes actually to obliterate the right of way for the beneficial use of its water rights that the Company currently holds, a limited fee with implied reverter for non-use, see *Big Bend Transit Co.*, 42 F.Supp. 459 (E.D. Wash.1941), by forcing it to apply for a license to run for a fifty year term, at the end of which the right to maintain and operate the dam would be up for license. This obviously *affects* the Company's right of way: Instead of having the right to use the "lands ... for [a] site[ ] for power purposes, and the beneficial use of said water" in perpetuity so long as it is used for the production of electric power or some other beneficial use, and the water so long as is consistent with Washington law, the Company would have merely the right to produce power for the term of the license. This would affect Washington Power's right of way in a manner prohibited by sections 23(a) and (b) of the Federal Power Act. Therefore Washington Power is exempted by the statute from being required to apply now for a license to operate and maintain the Little Falls facility under the Federal Power Act because its "valid existing right-of-way [was] granted prior to June 10, 1920." FPA § 23(b), 16 U.S.C. § 817.

We need not reach here the question of what compensation would be due for the revocation or acquisition of Washington Power's property rights in the Little Falls hydroelectric development. No state, municipal or federal entity now seeks to condemn the property under eminent domain. Nor does Washington Power voluntarily seek to exchange its valid right of way for a license under section 23(a). And since this case holds that the Federal Power Act exempts Washington Power from being required by the Commission presently to acquire a license for the Little Falls development under the Federal Power Act, we do not reach the issue of whether such a licensing requirement would be a "taking" under the Fifth Amendment to the Consti-

tution. It is clear, moreover, that the existing development at Little Falls did not from 1911 on lack any necessary authority for its construction, operation or maintenance or for its continuing operation and maintenance. Washington Power is therefore not required to apply for or obtain a license. Thus it is not at present subject to the cost-based "net investment" formula, as the Commission concludes are projects without pre-FWPA authority.

It follows from this analysis that Washington Power therefore has the option, but is not required, to exchange its current right of way for a license under the Federal Power Act. It should also be noted, however, that the right to occupy the river and to use the flow of the stream were acquired under the 1905 Act and Washington law and are property rights under that law. *Thompson v. Short*, 6 Wash.2d 71, 106 P.2d 720 (1940) (appropriative right is real property); *Tedford v. Wenatchee Reclamation Dist.*, 127 Wash. 495, 221 P. 328 (1923) (same); *Madison v. McNeal*, 171 Wash. 669, 19 P.2d 97 (1933) (right to appropriated water flowing naturally or in control works is an incorporeal hereditament). Since the 1905 Act, and subsequent enactments, incorporated these aspects of Washington property law by reference, Congress has already approved the acquisition of property rights in the water rights in the Spokane River acquired under the 1905 Act and the Washington law of appropriation. It is therefore clear that the present law cannot be construed to authorize the federal government simply to seize this property without paying just compensation, any more than it could seize land which Congress had authorized the federal government to sell and which had already been sold to private parties, without paying just compensation.

V. Navigability of the Spokane River

In addition to contending that the Company must apply for a license because the Spokane River is, in fact, "now" navigable at Little Falls, the Commission also contends that the River was a navigable wa-

terway of the United States in 1906–10 when the Secretary consented to and granted authority for the Little Falls development in accordance with the 1905 Act. We will deal with both contentions.

The river in its relevant stretches was not navigable when the Little Falls development took place. At that time the provision of the 1905 Act authorized the construction and operation of the Little Falls dam and the "beneficial use" of the water rights appropriated under the laws of Washington.

The Spokane River starts as the outlet of Couer d'Alene Lake in Idaho and flows generally northwest for 105 miles to join the Columbia River in Washington at Mile 317 above the Snake River. From its source to its confluence with the Columbia it has a total fall of 1,075 feet. This represents an average fall of 10.2 feet per mile over its entire length. The river is navigable *within Idaho* from Couer d' Alene Lake for eight miles to Post Falls, Idaho, five miles east of the Washington-Idaho boundary, where there is a natural drop of 40 feet. This stretch of the river from the lake to Post Falls is not obstructed by rapids and in 1932 had a fair depth due to the back water from the Post Falls dam. The floating of logs is the only commerce on this eight mile section of the river, which is entirely in Idaho.

As will be developed subsequently, the 97 miles of the river below Post Falls was *not* shown to be navigable either in Idaho or Washington when Little Falls was developed. From the foot of Post Falls to the head of Spokane Falls in Washington, 20 miles west of the state line, the river flows through a comparatively wide and level valley but has an average fall of 10 feet or more per mile. Spokane Falls is a series of falls and cascades with a natural drop of about 150 feet. It is also relatively shallow except during the high water season. Logs had been floated from the lake to Post Falls in Idaho but there was no general practice of driving logs below Post Falls across the state line into Washington, so far as this evidentiary record demon-

strates, except occasionally in *high water* many years ago. As the 1932 Report of the Army Engineers states:

> It would be impractical either to row a boat or drive logs between Spokane and Post Falls during the low water season, which averages about five months a year, *on account of the many rapids and very shallow depth of water.* During the season of high water, about three months of the year, the velocity of the water is so great that commercial navigation would be impractical and uneconomical due to the excessive power that boats would require.... There is no record to indicate that the Spokane River has ever been used as a highway for interstate commerce, and the river is not generally and commonly useful in any trade or agriculture.

Ex. No. 87 (emphasis added). *Report of Army Engineers*, 1932 (J.A. 621). The floating of logs during *high water* does not establish that this stretch of the River is a "navigable" stream. *United States v. Rio Grande Dam & Irrigation Co.*, 174 U.S. 690, 698, 19 S.Ct. 770, 773, 43 L.Ed. 1136 (1899) ("The mere fact that logs, poles and rafts are floated down a stream occasionally and in times of *high water* does not make it a navigable river") (emphasis added); 16 Am.Jur.2d 511, Waters, § 67 n. 65. A river is a navigable waterway of the United States if it constitutes a continuous highway capable of use for the purposes of transportation and commerce with other states or foreign countries in the customary modes in which such commerce is conducted by water or which may be made available for navigation given *reasonable* improvements. *The Daniel Ball,* 10 Wall. 557, 563, 77 U.S. 557, 563, 19 L.Ed. 999 (1871); *The Montello,* 20 Wall. 430, 441, 87 U.S. 430, 441, 22 L.Ed. 391 (1874); *United States v. Utah,* 283 U.S. 64, 51 S.Ct. 438, 75 L.Ed. 844 (1931); *United States v. Appalachian Electric Power Co.,* 311 U.S. 377,

406–08, 61 S.Ct. 291, 298–99, 85 L.Ed. 243 (1940).

"Below Spokane Falls the river is not navigable and *never* was navigable except for short stretches." [14] This stretch of the river "flows through a deep canyon flanked by high lands" most of the way.[15] With an average drop of 10.8 feet per mile, the river thus flows with high velocity and its "bed ... is composed principally of boulders, which cause a great many rapids; and the river is also obstructed by numerous falls." [16] "No improvements of this river have ever (1932) been authorized by Congress." [17] The physical characteristics of the river, as described in the official reports of the Army Engineers, thus made it nonnavigable from Post Falls to its mouth.

The Little Falls development is located on the Spokane River 70 miles below Post Falls, 45 miles below Spokane Falls and 29 miles from its confluence with the Columbia River (J.A. 637–42). According to the Report of the Army Engineers in 1932 there was no commerce on the Spokane River. The report further concluded:

> 17. Logs have been floated down the Spokane River to Post Falls; but there has been no general practice of driving logs below Post Falls, and the present practice of lumbering interests is to bring logs to their mills by either railroad cars or auto trucks.

> 18. With the exception of the one boat mentioned in [a] letter quoted in paragraph 13, there is no record of any boat traffic between Spokane and Post Falls.

> 19. If the river were ... useful, it would have been used for such purposes, especially in the earlier days of settlement before the development of other means of transportation. It is believed that the *physical characteristics* of the river explain the failure to use this river for purposes of navigation.

**14.** Report of Army Engineers, 1932; Ex. No. 87, ¶ 13 (J.A. 621–25).

**15.** *Id.,* ¶ 5.

**16.** *Id.,* ¶ 4.

**17.** *Id.,* ¶ 14.

20. The navigable portion of the Spokane River, which is that portion between Post Falls and Coeur d' Alene Lake, lies wholly within the State of Idaho.

21. It is concluded that *the Spokane River is not a navigable waterway of the United States, because the interstate stretch—between Spokane, Wash., and Post Falls, Idaho—is neither used nor susceptible of being used in its ordinary condition as a highway for commerce.*[18]

The nonnavigable character of the Spokane River from its mouth to Spokane Falls is corroborated by the Report of April 21, 1882 by Lt. T.W. Symons, Corps of Engineers, U.S. Army, transmitted by the Secretary of War to the United States Senate in response to Senate Resolution of April 5, 1882, "[r]especting the navigable waters of the Upper Columbia River and its tributaries."

The Spokane River ... flows through a cañon very similar to that of the Columbia, and about 2,000 feet below the general level of the plains to the south. It is broken by many rapids and falls, and *is entirely unnavigable.* From its mouth up to Spokane Falls, about seventy miles, this cañon is very deep and difficult to cross or traverse.

Ex. 159 (J.A. 766–70) (emphasis added). As indicated above at page 24, the nonnavigability of the Spokane River below Post Falls was also confirmed in 1905 by the Engineer on the ground (J.A. 623).

The War Department and the Army Corps of Engineers are the agencies that are directed to study and report on the nation's rivers, and they are empowered by the Rivers and Harbors Act to approve plans for dams, bridges, etc., that would obstruct navigable rivers of the United States. Their duties included the investigations in the field necessary to determine whether streams were navigable waters of the United States and they carried out these duties with respect to the Spokane River. *See* n. 20, *infra.* Their official reports thus carry particular weight. The official U.S. Geological Survey maps of the Spokane River over its entire length, from Couer d'Alene Lake to its confluence with the Columbia 105 miles to the West, indicate that numerous railroad and highway bridges cross over the River. The River Mile Index of the Spokane River from Little Falls to Couer d' Alene Lake (undated) indicate that 32 bridges cross the river (10 railroad bridges and 22 highway bridges) (J.A. 637–42). Yet the official *List of Bridges Over the Navigable Waters of the United States,* as compiled by the Chief of Engineers, United States Army, and revised to January 1, 1935, U.S. Government Printing Office, 1936, did not include *any bridge* over the "Spokane River." [19] This publication of the Army Engineers consists of 461 printed pages, and includes *every* railroad or highway bridge that crosses any navigable water of the United States. No where does this official publication mention the "Spokane River." The conclusion is inescapable from this, and all its prior Reports on the Spokane River, see n. 20, that the Army Engineers found that the Spokane River was *not* navigable.

If the Spokane River was a navigable water of the United States at the time the Secretary of Interior gave his consent to Wilson to appropriate and use the Little Falls water rights, and approved the several applications for rights of way necessary to build and maintain the dam, his actions may have been in violation of the Rivers and Harbors Act, 33 U.S.C. § 403. This Act requires that plans for building a dam that would obstruct a navigable waterway of the United States be consented to by Congress and approved by the Chief of Engineers and the Secretary of the Army. This was apparently not done in the case of the Little Falls dam. Thus, if the Spokane River was a *navigable* waterway of the

18. *Id.* (emphasis added).

19. We take judicial notice of the United States Geological Survey maps covering the Spokane River and the Army Chief of Engineers *List of Bridges Over the Navigable Waters of the United States* (1936) pursuant to Fed.R.Evid. 201.

United States at the time and place covered by the applications of Wilson and the Company, the Secretary of Interior's approval may have been insufficient under the Rivers and Harbors Act. However, such approval was not required because the river was not navigable.

The Commission's error is in finding, without substantial evidence, that the Spokane River was navigable. The findings, conclusions and interpretations of the War Department and Army Engineers conclusively demonstrate that at the time the Little Falls facility was constructed the Spokane River was entirely unnavigable.[20] However, the Commission does not recognize any necessity to evaluate the evidence of the river's physical features, or to be influenced by the conclusions of the official Reports of the Army Engineers, which constitute the only reliable probative evidence presented on the issue of navigability—an issue that is largely determined by the facts.

The Commission's brief argues that the Spokane River has *always* been a "navigable waterway of the United States." FERC Brief, pp. 23–24. However, it advances no respectable evidentiary support for this conclusion. It claims reliance principally on some flotation of logs from Post Falls, Idaho to Spokane Falls, Washington in the early days; but it advances no substantial evidence that is sufficiently probative to conclude that such flotation supports a claim of navigability. It does not advance any evidence from which it could be reasonably concluded that any logs were ever floated down river below Post Falls except during periods of *high water* and then only to a point *above* Spokane Falls. The Commission has not advanced one iota of evidence of any commerce of *any* character over the 70 miles of the River from Spokane Falls to its confluence with the Columbia. This is fatal to the Commission's claim. The Little Falls Development is on this stretch about 45 miles below Spokane.

The items of evidence that the Commission brief (pp. 23–24) relies upon to support its claim of navigability by the flotation of logs for the short distance from Post Falls to Spokane Falls are itemized and their complete deficiency as probative evidence pointed out in the margin.[21]

---

**20.** In 1881, the War Department investigated the Spokane River and determined it was not navigable. Sen.Doc. No. 186, 47th Cong., 1st Sess., (1982); Exhibit 159 (J.A. 764–70).

Pursuant to the Act of July 13, 1892, 27 Stat. 88, the Army Corps of Engineers undertook to determine whether the Spokane River was "worthy of improvement." The 1893 Annual Report of the Chief of Engineers concluded it was not. *See* Opinion No. 117A at 11 n. 9, 25 F.E.R.C. ¶ 61,002 at 61,024; Washington Power Supplemental Appendix, No. 2.

In 1905, the District Engineers of the Army Corps of Engineers wrote that the river was not navigable downstream from Post Falls, Idaho (J.A. 623).

In 1932, the Army Chief of Engineers, after an investigation, determined the river was not navigable (J.A. 621–25). The river was therefore officially determined to be non-navigable at Little Falls on four different occasions.

**21.** (1) First, the Commission cites Ex. No. 126, a pamphlet published in 1952 entitled "Steamboats in the Timber." This contains a brief reference to a log drive in "early days" to McGoldrick's Mill not far above Spokane Falls *"in early spring"* (J.A. 735) (R. 1193–96), i.e., high water time.

(2) Exhibit 130 is a map *"allegedly"* identifying the Spokane River as a public highway for logging activities as declared by the Washington Legislature in 1875 (R. 1211, J.A. 750). However, while the entire river is "Declared Public Highway for Logging by Act of Washington 1875," it is only from Lake Couer d' Alene to Spokane Falls that the river is *marked:* "Past Usage for Logging." Thus, even this bit of weak and inconclusive evidence does *not* indicate that the river *from Spokane Falls to* the Columbia, which includes the Little Falls stretch, was *ever used* for floating logs. In fact the marking on the map indicates that "Past Usage for Logging" stopped at Spokane Falls. Thus the conclusion is obvious that there was no "Past Usage for Logging" from Spokane Falls to the Columbia. Furthermore, the mere marking on the map above Spokane Falls is insufficient to prove the requisite navigability because of a lack of any indication as to when this stretch of the river was used "for logging." This map does not constitute probative evidence as to the time of year that "logging" occurred or as to whether it was limited to times of high water.

(3) Exhibit No. 127 is a 1958 pamphlet entitled "Sawdust Empire" (J.A. 736–39). The pamphlet recites that a "sawmill [was] erected ... [in 1873] on the banks of the Spokane River

In contradistinction to the deficient evidence of navigability that the Commission advances, the Report of the Army Corps of Engineers on the navigability of the Spokane River even as late as 1932, as quoted and described above, constitutes substantial *evidence* that the entire length of the Spokane River was *not* a navigable river of the United States prior to the completion of Grand Coulee Dam in 1942 (J.A. 765), *see also* Reports of Army Engineers itemized in n. 20, *supra*.

Our above description of the Commission's excursions in search of evidentiary support, some outside the record, and all constituting data of dubious probative val-

near the falls ... was not successful, for the saws could not cut through the large logs that were floated down the River...." (R. 1197–1201, J.A. 738). Again, this 1958 publication lacks any reference to the *time* the logs were floated down the river. There is no indication as to the time of year that the logs were floated.

(4) Exhibit No. 129 *allegedly* "contains an 1884 newspaper account of a log drive down the Spokane River to Spokane Falls" (R. 1209, J.A. 747). This claim at page 24 of the Commission's brief is bizarre. It claims that its assertion of navigability is supported by a newspaper story in a Spokane newspaper of June 30, 1884 reporting that a "Tom Johnson was drowned today while driving logs a *couple of miles* from Fort Couer d' Alene, on the Spokane River" (J.A. 747) (emphasis added). But Fort Couer d' Alene was built in 1878 on a "thousand acres *near the outlet*, where the lake [Couer d' Alene] drains into the Spokane River. Much of this thousand acres is *now within the boundaries of the City of* Couer d' Alene" (J.A. 733). Couer d' Alene is *in Idaho* about 12 miles *east* of the Washington state line. Thus, one driving logs *"a couple of miles"* from the Fort would clearly be in Idaho and most likely east of Post Falls, Idaho. The river above Post Falls was always recognized as navigable, but only within Idaho, and Johnson's drowning does not indicate interstate navigability. The newspaper's statement that Tom "has a brother in Helena, Montana" (J.A. 747) is insufficient to support the necessary interstate element for the log traffic.

(5) Exhibit No. 128 (R. 1202–07, J.A. 741–46) is an opinion, 50 Fed. 429, by a U.S. District Judge, Circuit Court, D. Idaho, of April 9, 1892, from which the Commission's brief quotes the statement that the "Spokane River is of sufficient size and of such a channel as to be held a public highway" (R. 1207, J.A. 746). But this is *not* the holding by the Court. The opinion continues, but the Commission brief omitted the following significant statement: *"If this indication is confirmed by a full production of the facts,* its waters must so far flow unfettered that they may be utilized by the public for transportation purposes" (J.A. 746). The omission is telling and adverse to the Commission's contention.

This was a case *in Idaho* which sought an injunction against one Post from placing obstructions in the Spokane River that prevented floating down the stream a lot of logs it *"now"* has just above such obstructions. Since the date of the opinion of the District Judge was *April 9,* 1892 its reference to "now" is another indication of high water time (J.A. 742). The judge also stated: "The facts are not fully before me ..." (J.A. 743) and that: "It is unnecessary to discuss the old English rule and definition of a navigable stream" (J.A. 746). He did state that the "Spokane River is of sufficient size and of such channel as to be held a public highway" (R. 1207, J.A. 746), but he was obviously speaking of the river in Idaho above Post Falls. That short stretch of the River in Idaho was always considered to be navigable, but only from the lake to Post Falls, *in Idaho*.

(6) The Commission brief also cites a statement in Exhibit No. 133. This is a publication entitled "American Lumberman" which reports that on August 25, 1900, a *United States Marshal"* handed down a decision" that the Spokane River was a navigable stream (R. 1217, J.A. 756). The exact quotation is:

In the case of complaint against the Spokane & Idaho Lumber Company for violating the federal statutes in allowing sawdust and other refuse to enter the Spokane river, a navigable stream, the United States marshal has handed down the following decision:

"That the defendant did allow refuse and other material to enter the river from its mill."

"That the river is a navigable stream."

"And that the defendant has violated the statute when it threw this refuse in a navigable river, whether it obstructed navigation or not."

The decision is subject to review by a *higher court* ...

(J.A. 756) (emphasis added). This does not indicate whether the mill was in Idaho or Washington, and there was no indication where the sawdust was dumped. Likewise, it is not presently considered that the statement of the Marshal is equivalent to a court decision (J.A. 756).

The foregoing sets forth all the evidence that the brief of the Commission asserts in support of its claim that the Spokane River was a navigable water of the United States. The probative effect of the official Reports of the Army Engineers that the Spokane River was *never* a navigable waterway of the United States far overshadows the foregoing claims to evidence advanced by the Commission. The Commission's contention that the foregoing evidence supports its claim is obviously deficient.

ue, demonstrate the tenuousness of the Commission's conclusions on navigability. *See also* 25 F.E.R.C. ¶ 61,002 at 61,027 (Butler, Chrmn., dissenting). The Commission's *de novo* review reaches the height of absurdity, however, when it holds that the Spokane River has *always* been navigable because only one improvement was necessary to make it so, that is, the construction on the Columbia River of the Grand Coulee Dam, the largest concrete structure in the world.[22] One of the great engineering marvels of this century, the Grand Coulee Dam created a 51-mile long lake in the Columbia canyon and backs water 29 miles up in the canyon of the tributary Spokane River to the tail race below the Little Falls development. 29 F.E.R.C. ¶ 61,002 at 61,-003.

The Commission apparently views this immense project as the sort of "artificial aid" to navigation to which the Supreme Court referred in *United States v. Appalachian Electric Power Co.*, 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243 (1940). 25 F.E.R.C. ¶ 61,002 at 61,005. This is implausible. *Appalachian* limited the situations where a river is susceptible to being made navigable given "a balance between cost and need at a time when the improvement would be useful." 311 U.S. at 407–08. The Grand Coulee Dam was not an improvement that was *reasonable* in cost and need to make the Spokane River navigable. The cost was extraordinary and the improvement of the navigability of the Spokane river was minimal—only from the confluence with the Columbia to the tail race *below* the Little Falls Development. As to the reasonableness of the cost, *Mason Co. v. Tax Comm'n*, 302 U.S. 186, 192, 58 S.Ct. 233, 236, 82 L.Ed. 187 (1937), recites that the Grand Coulee project, as originally contemplated by the War Department and the Department of the Interior, included a dam at Grand Coulee to be 370 feet high above low water (550 feet high as actually constructed)[23] and 4,290 long on the crest, a

power plant to develop 2,100,000 horsepower at a contemplated total cost of $392,000,-000 in depression dollars. It created a lake 51 miles long and stored over 5,000,000 acre feet of water. Improving navigability on the Spokane River was one of its very minor purposes.

 While the Grand Coulee Dam did create a navigable lake, it is absurd to suggest that it is the sort of "artificial aid" that would retroactively convert the entire Spokane River into a navigable water of the United States back to a time when dams were constructed with the aid of mules and man-operated wheelbarrows. Such theory would make practically all streams navigable; the gnarliest rivulet in the Rockies might be made to accommodate pleasure craft if the energy and enormous capital outlay it took to build Grand Coulee were devoted to the task. The Supreme Court was not so obtuse as to miss this problem in deciding *Appalachian.* Thus the Court in *Appalachian* wrote, "The district court is quite right in saying there are obvious limits to such improvements as affecting navigability. These limits are necessarily a matter of degree." 311 U.S. at 407, 407 n. 26. Navigability must be achieved at a *reasonable cost.* The "contemplated" cost of $392 million in depression (1933) dollars, is not a "reasonable cost" to make the tributary Spokane River navigable only from its mouth to Little Falls. We may safely conclude, following the *Appalachian* Court, that as a matter of degree the Court did not mean to include concrete works of titanic proportions (550 feet high and 4,290 feet long)[24] involving "high engineering skill and the expenditure of vast sums of money" as reasonable improvements to navigability. *United States v. Rio Grande Dam & Irrigation Co.*, 174 U.S. 690, 699, 19 S.Ct. 770, 773, 43 L.Ed. 1136 (1899); *Appalachian*, 311 U.S. at 408–09, 61 S.Ct. at 299–300.

---

**22.** Guinness Book of World Records 269 (1981).

**23.** The Washington Monument is 555 feet high. World Book Encyclopedia.

**24.** *Mason Co. v. Tax Comm'n*, 302 U.S. at 192, 58 S.Ct. at 236, *supra.*

■ At all times relevant to this case the Spokane River was *not* navigable. It was properly found *not* to be navigable by those to whom that duty was assigned and the evidence of the physical features of the river as described in all the Army Engineer's reports over half a century, *see* n. 20, *supra,* are convincing probative evidence of the fact that it was not navigable in fact when the Little Falls development was constructed. Thus, under the terms of the 1905 Act Washington Power and Wilson were authorized to construct the Little Falls development without obtaining the approval of the War Department or Chief of Army Engineers, since it could not be anticipated, some thirty years before the fact, that the largest concrete dam in history would someday flood the lower reaches of the Spokane River Valley to the tail race below Little Falls and make navigable a part of a stream that was formerly all but impassable by canoe.

The Commission's failure to give adequate deference to the 1932 Army navigability report and all its earlier reports, *see* n. 20, *supra,* is further shown in its selective reading of Exhibit 159 (the 1893 report on navigability). This reading by the Commission, however, does no more to support its finding of navigability than does its viewing Grand Coulee as a reasonable navigation aid. The *conclusion* of the 1893 report was that the river was *not* navigable, 25 F.E.R.C. ¶ 61,002 at 61,024 n. 9, and to use that report in the selective manner the Commission does in its attempt to support the conclusion of navigability is to contradict its own evidence and make a mockery of the deference properly owed to the authoritative findings on the river's navigability at the times relevant to this case.

Even if there were something to the Commission's bizarre route through the navigability question, it neglects the doctrine that a river may be found to be navigable in part and nonnavigable in part. *United States v. Utah,* 283 U.S. 64, 89–90, 51 S.Ct. 438, 445–46, 75 L.Ed. 844 (1931). Insofar as this case is concerned the authoritative findings by the Army Engineers

are controlling: "Below Spokane, the river is not and never was navigable except for short stretches...." Ex. 87, April 29, 1932. And Congress *never* found it necessary to consent to the erection of any of the many bridges over the river. No substantial evidence contradicts these conclusions or the facts upon which they are based. There is nothing in this record which suggests that when the Little Falls dam was erected it obstructed a navigable portion of a navigable river of the United States, even if some intrepid lumberjacks did manage, *during high water* some 65 to 45 miles upstream from Little Falls, to float some logs down a short stretch of the river.

At the present time, that part of the Spokane River from the Little Falls Development to the Columbia is *now* recognized as navigable by the Army Corps of Engineers (J.A. 634–35). This was due to the completion of the Grand Coulee Dam as we note above. 25 F.E.R.C. ¶ 61,002 at 61,003. Thus the Commission would have jurisdiction to license any *new* structures built on the now *navigable* portion of the River under the Federal Power Act. It cannot, however, expunge the fact and the determinations that the river was *not* navigable when the Little Falls development was authorized and constructed, and by so doing evade the provision of section 23 of the Federal Power Act that none of the "provisions" of the present Act shall "be construed as affecting any permit or valid existing right of way ... granted [before June 10, 1920] ... or as affecting any authority ... given pursuant to law [before June 10, 1920]." § 23(a), *supra.*

The Commission claims reliance on our earlier decision in *Pennsylvania Water & Power Co. v. FPC,* 123 F.2d 155 (D.C.Cir. 1941), *cert. denied,* 315 U.S. 806, 62 S.Ct. 640, 86 L.Ed. 1205 (1942), for the proposition that an operator of a hydroelectric project could not rely on a previous holding in 1904 of nonnavigability by the Secretary of War under the Rivers and Harbors Act with respect to *another project* in Maryland (a bridge on the same river), as im-

plied consent for the erection and maintenance of the company's structure in Pennsylvania. The *Pennsylvania* case involved a 1938 order by the Federal Power Commission that the Power Company obtain a license under section 23 of the Federal Power Act for its power dam built between 1905 and 1909 (FPC Brief, p. 5) in the Susquehanna River near Holtwood, Pennsylvania. As set forth below our decision in *Pennsylvania* is clearly distinguishable on the facts, and is not precedent on the issues raised with respect to the development at Little Falls.

First, the court in *Pennsylvania* found that the evidentiary record going back to 1797 supported the Commission's finding that the Susquehanna *was* a navigable river of the United States when the Holtwood Dam was constructed, while the evidence here with respect to the Spokane River is that it was *not* a navigable river of the United States, when the Little Falls Dam was built.[25]

Second, the Holtwood dam was not built on a "valid" right of way because the provisions of section 9 of the Rivers and Harbors Act of 1899 were fatal to Pennsylvania's claim and the Company could point to no statutory authority. Section 9 provided, *inter alia:*

> that such structures [dams] "may be built under authority of the legislature of a state across rivers ... the navigable portions of which lie *wholly* within a single state, *provided* the location and plans are submitted to and approved by the Chief of Engineers and the Secretary of the Army before construction commenced....

33 U.S.C. § 401 (emphasis added).[26] The Company contended that the Susquehanna was not a navigable river of the United States but was *only* navigable within Pennsylvania. It had never submitted the location and plans for the dam for the statutorily required federal authority. In thus admitting that the dam was erected in waters that were navigable *"within a single state,"* i.e., *Pennsylvania,* given the requirements of section 9, the company was hung by its own theory. Here, however, the record reflects that the Little Falls dam was not erected in any waters that were navigable within Washington. Even if they were, there is considerable force to the argument that Congress in its *special* Act of March 3, 1905, applicable *only* to the Spokane River along the southern boundary of the Spokane Indian Reservation, had provided a complete alternative to section 9 of the Rivers and Harbors Act and compliance therewith was all that was required to establish the *"valid ... right-of-way"* required by section 23.

Third, the Pennsylvania Power Company was never "granted ... any ... right-of-way [or] ... authority" by any federal authority, such as Wilson and Washington Water obtained here by the consent, grant and authorization from the Secretary of Interior in accordance with the 1905 Act. Hence the Pennsylvania Power Company was not entitled to the exemptions in section 23 which are available here to Washington Power and which are fatal to the Commission's contentions. It follows that the decision in *Pennsylvania Water & Power Co.,* has no application to this case because the Little Falls development satisfies the section 23 conditions for exemption, and the Spokane River at Little Falls was *not* shown at the relevant times to have been on a *navigable* stretch of the river, interstate or intrastate.

---

**25.** *See* discussion at p. 326, *supra.*

**26.** The court sustained the FPC's ruling that the Susquehanna at the location of the dam was a navigable water *of the United States* despite a ruling in 1904 by the Secretary of War that the river was only navigable in one state, i.e., Pennsylvania, and that the Pennsylvania Railroad therefore had a right to build a bridge over the river at Havre de Grace, Maryland. However, no authorization was ever obtained from any federal official to build the Holtwood Dam and there was no special act of Congress authorizing such construction. The Little Falls development is distinguishable on both grounds—(1) the Secretary of the Interior authorized the project, and (2) the authorization conformed to a special Act of Congress.

In *Pennsylvania,* this court, citing *Newport & Cincinnati Bridge Co. v. United States,* 15 Otto 470, 480, 105 U.S. 470, 480, 26 L.Ed. 1143 (1881), held that "the supervision and control by Congress of navigable waterways 'is continuous in its nature' and no part of this power and supervision 'will be presumed to have been surrendered unless it was manifestly so intended.'" 123 F.2d at 162. This case would support the Commission insofar as it relies on the decision to support its jurisdiction over any *new structures* proposed for stretches of the Spokane River that are "navigable waters of the United States."[27]

The rights acquired by Washington Power from Wilson and approved by the Secretary of Interior were not conditioned, however, on the river remaining nonnavigable, nor are the exemptions in section 23 so conditioned. In fact, when enacted, they expressly related to, and were limited to, rights *validly* acquired in the past—"pursuant to law." § 23(a). This is an obvious reference to *law* existing at the time the permit or right of way was granted or acquired. Congress in its continuous supervision of navigable waterways *could* have legislated that all projects occupying nonnavigable waterways of the United States would require licenses if the rivers they occupied subsequently became navigable, even if they did not need licenses before and had prior existing rights of way. But Congress did not take this course. It did just the opposite: It preserved all *valid* rights of way acquired by grant pursuant to law prior to June 10, 1920 against being "affected" by being required to obtain a license to operate. 16 U.S.C. §§ 816, 817.

If the Spokane River *had* been a navigable river of the United States in 1910, as it was not, the necessity for complying with the requirements of the Rivers and Harbors Act would have been in a different posture. But since the stream was not navigable at that time, the Rivers and Harbors Act was not violated by the construction of the dam, and the right of way was *validly* acquired under then existing law. Such jurisdiction as the Commission may have subsequently gained over the lower part of the stream by the erection of the Grand Coulee Project was subject to and limited by section 23 of the Federal Power Act.[28] FERC's authority under the Federal Power Act, by virtue of section 23, specifically excludes the compulsory licensing of existing power dams constructed under a "valid right-of-way" granted prior to June 10, 1920—valid means valid when acquired.

The Commission nonetheless boldly embarked on a belated excursion into the legislative history of the Federal Power Act of 1935 and its predecessor, the Federal Water Power Act of 1920, in the same spirit in which it undertook its purported historical investigation of the 1905 Act. Its study of the 1905 Act, which explicitly provided for the hydroelectric development of the Spokane River along the southern boundary of the Spokane Indian Reservation, attempted to show that the Act in fact did *not* authorize the construction of power dams. Its research into the Federal Power Act of 1935 similarly purports to demonstrate that its exceptions do not mean what they say. *See* 25 F.E.R.C. ¶ 61,002 at 61,011. The Commission's theory as to section 23(b) is difficult to summarize and its logic is somewhat opaque. From the House and Senate reports, H.Rep. No. 1318, 74th Cong., 1st Sess. (1935) and S.Rep. No. 621, 74th Cong., 1st Sess. 1, 47 (1935), and language in *United States v. Appalachian Electric Power Co.,* 311 U.S. 377, 424, 61 S.Ct. 291,

---

**27.** Similarly *Montana Power Co. v. FPC,* 185 F.2d 491 (D.C.Cir.1950) is completely distinguishable because the Commission had before it in that case substantial evidence that the Missouri River in the relevant section was navigable. *Id.* at 494–97. That is not the case here.

It is recognized that the Commission contends that the river was *always* navigable because all it needed was the Grand Coulee Dam to make a small part of it navigable. But that argument refuses to take into account then existing Supreme Court decisions, the engineering limitations existing around 1905 and that even when Grand Coulee became possible and was erected it was a more enormous improvement than could *reasonably* have been expected would be undertaken to make the Spokane River navigable at any relevant time.

307, 85 L.Ed. 243 (1940), the FERC apparently means to infer, though its language is unclear, that the Federal Power Act and the Rivers and Harbors Act acting together prohibit the *maintenance or operation* of any dam on a navigable waterway without a license from the Commission, *even those that have pre-FWPA authority.* 25 F.E. R.C. ¶ 61,002 at 61,013.

The FERC's astonishing interpretation of section 23(b) would eviscerate the prohibition Congress clearly placed on any authority the Commission possessed to "affect" valid existing rights of way, including those at Little Falls in this case. Section 23(b) of the Federal Power Act unequivocally states that "[i]t shall be unlawful for any person ... to construct, *operate or maintain* any dam ... in any of the navigable waters of the United States ... *except under and in accordance with the terms of a permit or valid existing right-of-way granted prior to June 10, 1920.*" Thus this exception in section 23 runs specifically to the construction, operation and maintenance of power dams. Yet in the face of this clear mandate, and the similar import of section 23(a), the Commission attempts to rely on the legislative history, and completely unpersuasive and not particularly ingenious history at that, to conclude that "the *1899* statute, in common with the 1935 statute prohibits ongoing operation activities as well as initial construction activities." *Id.* This perverted construction converts the prohibition the statute imposes on the Commission into a prohibition on those who "operate or maintain any dam ... [on an] existing right-of-way granted prior to June 10, 1920." If that construction can be deduced from the applicable statutes then anything is possible.

 This is an egregious example of an attempt to rely on legislative history in order to circumvent the clear intent of Congress. There may be cases where it is unclear whether a given power development was in fact constructed and continues to be operated and maintained under valid pre-FWPA authority, or whether the stat-

ute authorizing construction gave complete authority, and thus whether the pre-1920 exception to the Federal Power Act applies to it. But this is not such a case. Where the record discloses that a power development clearly *was* constructed by 1910 and has been operated and maintained continuously under complete and valid authority granted prior to the creation of the Commission, as the Little Falls development was and is, the statute clearly prohibits the Commission from construing the obligation retroactively to require subsequent licensing by the Commission.

That the Commission's jurisdiction does not extend to developments with valid pre-FWPA authority is absolutely clear from the plain language of section 23 of the Federal Power Act. In accordance with the provisions of the 1905 Act the Secretary of the Interior gave his "consent" to Wilson and Washington Water Power Company (the appropriators) acquiring "the right to the use of the waters of the Spokane River ... *by appropriation* under and pursuant to the laws of the State of Washington"; and, in keeping with the purposes declared in the title of the 1905 Act, he granted the "appropriators land on said reservation ... for the erection of dams [etc.] ... for the development of power [and] for the beneficial use of said water." 33 Stat. 1006. The language of the 1905 Act, in providing "[t]hat the right to the *use* of the waters of the Spokane River ... may ... be acquired ... by appropriation under ... Washington [law]," *id.,* implicitly includes the right to construct a dam in the Spokane River at Little Falls as only by the construction of a dam was it possible for the waters of the River to be appropriated and beneficially used "for power purposes." *Id.*

In sum, the development at Little Falls "for power purposes and the beneficial use of said water"[29] was constructed and operated in full compliance with the 1905 Act. There is no reasonable contention to the contrary. At that time, given the nonnavi-

**29.** Title of 1905 Act.

gablity of the river, there was no applicable federal or state law that required any further authority. Existing federal laws only required approval of dams and obstructions in streams that were *navigable,* interstate or intrastate. Thus, it cannot be substantially questioned on this record that the Secretary's consent and grant, which included the "right-of-way" for the statutorily stated purposes, was "valid," and it is the "right-of-way" for the purposes granted that is protected and which the Commission illegally seeks to *"affect."* Given the title and provisions of the Act that refer to the "erection of ... dams ... for the development of power" [30] it is clear that the Act did authorize the "erection" of dams, etc., for the appropriation of water for power purposes. The incorporation into the 1905 Federal Act of the water laws of the State of Washington, under which riparian owners on nonnavigable streams had the right to build dams to appropriate water rights, in effect empowered the Secretary of the Interior, by his "consent" to acquiring water rights by appropriation under Washington law, to authorize the erection of dams, etc., on reservation lands granted to an appropriator. It is also apparent that the Secretary correctly interpreted the 1905 Act as requiring his authorization to "erect the dam," which was given. There was no federal power act in effect prior to 1920. The Company therefore had both complete authority to build the dam at the time of construction and the valid right of way for that purpose granted before June 10, 1920, which is all that is required for the section 23 exception to apply.

The appropriation, construction and maintenance complied with the terms and conditions of the 1905 Act, and section 23 of the Federal Power Act prohibits the Commission from doing anything that would "affect" the rights so acquired. The Chairman of the Commission remarked on the "extraordinary lengths" to which the Commission reaches in its attempt to "extend its jurisdiction over Little Falls Dam." 25 F.E.R.C. ¶ 61,002 at 61,027 (Butler, Chrmn., dissenting). Indeed, one can hardly avoid the impression that the Commission, determined to seize jurisdiction over the property of the Washington Water Power Company, simply decided not to let the expressed intent of Congress stand in its way. We cannot countenance such a gross misconstruction of the statute.

## VI. CONCLUSION

It is concluded that: (1) The Washington Water Power Company by appropriation acquired the water rights and the lawful right of way for the construction of a dam to divert, store and beneficially use the subject waters of the Spokane River and now owns the rights, title, interests, authority and right of way necessary for the construction, operation and maintenance of the Little Falls Power Development; (2) prior to June 10, 1920 such rights, etc., were acquired and granted in accordance with the special Act of March 3, 1905 (33 Stat. 1006) and the laws of Washington made applicable by such Act; (3) the continuous operation and maintenance of the Little Falls Power Development by the Washington Water Power Company is exempted from the application of the Federal Power Act by sections 23(a) and (b), 16 U.S.C. §§ 816, 817, of said Act; (4) Commission Opinions Nos. 117 and 117–A and Orders pursuant thereto, are in violation of section 23 of the Federal Power Act, are invalid to the extent that they seek to require the Washington Water Power Company to apply for and obtain a license for the continuous operation and maintenance of the Little Falls Power Development, and therefore are reversed to such extent. The case is remanded to the Federal Energy

---

**30.** *Id.,* Sec. 2. We have considered the Commission's argument that it may base jurisdiction on the coordination of the Little Falls development with other developments over which FERC has jurisdiction. Since we have found that Washington Power has a valid right of way that may not be "affected" under the FPA 23(a) and (b) exception, the coordination argument is without merit. We have considered the Commission's remaining arguments and find them without merit.

Regulatory Commission for further action not inconsistent with this opinion.

*Judgment accordingly.*

MIKVA, Circuit Judge, dissenting:

Despite the majority's extensive and complex opinion, the questions in this case are quite straightforward. Section 23 of the Federal Power Act, 16 U.S.C. §§ 816–817 (1982) (FPA or Power Act), states that no person may operate a dam on navigable waters of the United States without being licensed under the FPA. There is an exception to this requirement: a person need not be licensed if he obtained a right-of-way to build the dam before the FPA became effective in 1920.

Petitioner Washington Water Power Company (Washington Power or the Company) operates a dam at the Little Falls section of the Spokane River in Washington state. The Company claims that it is not required to obtain a license under the FPA for two reasons. First, it contends that the Spokane River was not navigable at the time the dam was built (1908–11), and so the FPA by its terms does not apply. Second, Washington Power argues that even if the FPA is applicable, the dam was built pursuant to a valid right-of-way given by a special statute in 1905 (the 1905 Act). (The Company bought the right-of-way from David Wilson, the original grantee under the 1905 Act). This, the Company claims, brings it within the exception outlined in § 23 of the FPA.

The Federal Energy Regulatory Commission (FERC or the Commission) rejected these arguments and ordered the Company to apply for a license. *Washington Water Power Co.,* 15 F.E.R.C. (CCH) ¶ 61,039 (1981). The Commission also rejected Washington Power's claim that FERC was barred from imposing the license requirement by collateral estoppel.

In deciding whether to uphold the Commission's decision that the Little Falls dam should be licensed, this court must answer three relatively simple questions. First, is Washington Power beyond the jurisdiction of the Commission and the Federal Power Act if the Spokane River was not navigable at the time the dam was built? Second, did the right-of-way given to the Company by the 1905 Act include the right to build a dam? Third, is FERC now barred by collateral estoppel from requiring Washington Power to apply for a license?

Because I believe that all these questions should be answered negatively, I would uphold the FERC decision.

A. *Scope of the Federal Power Act*

The first question is whether the FPA applies to the dam on the Spokane River at all. There is no question that the river is now a navigable waterway. The majority, however, feels that because it was not navigable when the dam was built (I will assume, *arguendo,* that this is true), or in 1920 when the FPA was passed, that the Little Falls project is not covered by the terms of the Power Act. This approach has two flaws: it is an overly restrictive interpretation of the statute's scope, and it ignores the other sections of the FPA that give the Commission jurisdiction.

The majority undertakes an exhaustive examination of the evidence as to whether the river was navigable either when the dam was built or when the Power Act was passed. I think this discussion misses the point; the case law in this circuit makes it plain that FERC's jurisdiction is not as constrained as the majority assumes. In *Pennsylvania Water & Power Co. v. Federal Power Commission,* 123 F.2d 155, 162 (D.C.Cir.1941), *cert. denied,* 315 U.S. 806, 62 S.Ct. 640, 86 L.Ed. 1205 (1942), a dam owner on the Susquehanna River refused to apply for a statutory permit to continue his operations. He argued, *inter alia,* that he had built the dam in reliance on the Secretary of War's determination that the river was not navigable. After finding that the river was currently navigable, the court said that the Commission's control over the nation's waterways was "continuing in nature," adding "[i]t cannot be considered, we think, that Congress [in § 23 of the FPA] meant to allow existing obstruc-

tions to continue unregulated in the navigable streams of the United States." *Id.* at 162, 163. Because it is conceded by all parties in this case that the Spokane River is navigable today, *see* maj. op. at 332, an earlier finding of non-navigability will not defeat the Commission's jurisdiction under the Power Act.

The majority's attempt to distinguish *Pennsylvania Water* by saying that FERC's jurisdiction will only reach *new* projects on the Spokane River is unpersuasive. It ignores the language of § 23 which says that a person may not build *or maintain* a dam on a navigable river without a license. Because the Spokane is now navigable, the dam at Little Falls must be maintained in compliance with the statute, despite any earlier findings of non-navigability. The majority's effort to restrict jurisdiction to a previous state of nature is as antediluvian as it sounds. Such a concept would make it impossible for Congress to protect and regulate our inland waterways, because many portions of such waterways at one time or another were non-navigable. This parsimonious measure, given the grand design of a national system of waterways, treats our rivers as if they were backyard wading pools.

Even if the river's current navigability did not give the Commission jurisdiction, there are independent grounds for finding that the Power Act applies. Section 23(b) of the FPA gives FERC jurisdiction over a dam or electric facility if it is on "any part of the ... reservations of the United States." 16 U.S.C. § 817 (1982). *See Federal Power Commission v. Oregon,* 349 U.S. 435, 75 S.Ct. 832, 99 L.Ed. 1215 (1955) (acts relating to water appropriation do not limit Commission's right to license water power project on government reservation). A "reservation" is defined by § 3(2) of the FPA to mean any interest in land owned by the United States. 16 U.S.C. § 796(2) (1982).

In this case there is no dispute that the United States has a reversionary interest in the land along the north bank of the Spokane; Washington Power has title to the land *for so long as* it is used for generating electricity. *See* 15 F.E.R.C. (CCH) ¶ 61,039 at 61,070–71. Should the Power Company stop using the land for this purpose, title would revert to the government. This is *not,* as the majority suggests, a determination that Washington Power no longer has good title to the land. It only means that the government has a reversionary interest in the event of non-use, and that this interest gives FERC jurisdiction.

A final reason that the FPA applies to petitioner's dam is that it operates along with other, licensed projects to form an "integrated unit of development." It is well settled that the Commission may license projects, even those on non-navigable rivers, if they affect interstate commerce. *Federal Power Commission v. Union Electric Co.,* 381 U.S. 90, 85 S.Ct. 1253, 14 L.Ed.2d 239 (1965). There was testimony before the Administrative Law Judge below that strongly supports the notion that the Little Falls dam is part of a larger network of generating plants that sells power both intra- and interstate. One witness testified, for example, that the Company controlled water releases from the entire Spokane River development to enhance the generation at Little Falls. *See generally Washington Water Project,* 48 F.P.C. 339, 340 (1972). Congress's powers over interstate commerce are broad enough that FERC may license all projects that affect it, whether the river is navigable or not. *See Niagara Mohawk Power Corp.,* 4 F.E.R.C. (CCH) ¶ 61,009 (1978) (eight projects licensed as one unit).

The majority's response to these bases for jurisdiction is to dismiss them with the wave of its hand. In a footnote it says that because a finding that the Power Act applied in this case would "affect" the Company's rights (which is prohibited by FPA § 23(a)), that the statute must not apply. Maj. op. at 63 n. 30. But this argument is logically flawed: it assumes that the Commission may not require the Company to obtain a license; since Washington Power does not have to obtain a license, any change requiring it to do so would "affect"

its right-of-way; therefore (the reasoning goes) the Company must not be required to obtain a license, and so the FPA must not apply. But if, as I suggest below, the Company was *not* granted a right to build a dam by the 1905 Act, then FERC jurisdiction cannot be defeated on the ground that requiring a license would affect the Company's rights. In fact, *not* to require a license would *enlarge* the rights now enjoyed by Washington Power; this is also prohibited by § 23(a).

Whether the 1905 Act did or did not grant the right to build a dam is a separate question from whether the Federal Power Act applies in the first instance. Whether FERC has jurisdiction under the Power Act cannot be determined by begging the question of petitioner's rights, and then rejecting all claims that would somehow affect those rights.

Because FERC has continuing jurisdiction over the nation's rivers, because part of the Little Falls project is on a United States reservation, and because the dam is part of a network that affects interstate commerce, I believe that the Federal Power Act applies to this case. So the crucial question becomes whether the Little Falls project fits within the exception to the licensing requirement: specifically, did the 1905 Act include the right to build a dam?

### B. *The 1905 Act*

If the 1905 Act gave the right to dam the river, then petitioner is not required to obtain a license under § 23(b) of the Power Act. This subsection provides that no license is required if a person operates a dam in accordance with a valid right-of-way granted before 1920, the year the FPA went into effect.

We begin with the language of the Act. The 1905 Act gave the grantee the right to "use" the waters of the Spokane. Depsite the majority's assurances, I am not convinced that the plain meaning of "use" includes the right to build a dam. "Use" could mean "consume *and* occupy" the river waters, in which case a dam would certainly be included; on the other hand it could just mean "consume." The majority repeatedly points out that the purpose of the statute was to encourage electric power production, but this does not mean *a fortiori* that a dam was intended. As FERC noted in its opinion below, not all hydroelectric projects involve obstructing the river. 15 F.E.R.C. (CCH) ¶ 61,039 at 61,078 n. 18. Creation of obstructions was normally discouraged in river legislation, and it is not as clear to me as it is to my colleagues that the Act on its face gives a grantee the right to construct a dam.

Because the language of the statute is ambiguous, we turn to the legislative history. *Allen v. State Board of Elections,* 393 U.S. 544, 570, 89 S.Ct. 817, 834, 22 L.Ed.2d 1 (1969). Although determining congressional intent is always an imperfect science, the fruits of the search are very specific in this instance. The *precise* question we face was asked and *emphatically* answered during the debate in Congress. As the majority notes, the following exchange took place:

> Mr. Dalzell: How is the water power to be used, by dams in the river?
>
> Mr. Jones: They will *probably* dam the river. This is a matter they are willing to take care of at *some future time*....
>
> Mr. Dalzell: From what committee is this bill reported?
>
> Mr. Jones: From the Committee on Indian Affairs. It simply affects Indian lands and provides means by which persons can acquire the permanent rights.
>
> Mr. Lovering: *Does it carry the right to dam the river?*
>
> Mr. Jones: *Oh no, not at all.* That matter, if it came up, would have to go to the Committee on Interstate and Foreign Commerce. They have to take their chances on that.

39 Cong.Rec. 2413 (1905) (emphasis added).

I do not know how the legislative intent could be clearer. The drafter of the bill, Mr. Jones, gave an unqualified answer to a very specific question—the 1905 Act does not give the right to construct a dam.

The majority strives mightily and unsuccessfully to twist the above language into something else. It speculates that when Mr. Lovering asked "Does it [the Act] carry the right to dam the river?", he actually meant to say "Should this bill be considered by the Committee on Interstate and Foreign Commerce?" Maj. op. at 316–17. Its reasoning is that Mr. Lovering inquired about the proper committee because the Commerce Committee had jurisdiction over *navigable* waterways. Why this question should be asked (and why in this form) when only moments before Mr. Jones had said that the water was not navigable (and therefore did not have to be considered by the Commerce Committee), should cause the majority some problems.

The court also finds an irreconcilable conflict between the plain meaning of the statement that the bill gives no right to construct a dam, and Mr. Jones' earlier statement that "[t]hey [the grantees] will probably dam the river ... at some future time." To my mind the two statements are perfectly consistent. All the parties involved expected that whoever received the right to use the water would probably dam the river eventually. But the right to do so was not included in the bill; therefore, it is a matter the grantee would have to take care of "at some future time." If the grantee or his assignee did wish to build a dam later, he would have to get specific permission from Congress; because the 1905 Act did not give this right, "[t]hey would have to take their chances on that."

This interpretation gives the simple, obvious meaning to everything the Congressmen said. It is also consistent with the general rule that grants should be construed strictly in favor of the public and against the grantee. 3 C. Sands, *Statutes and Statutory Construction* § 60.02 at 81, § 64.05 at 120 (4th ed. 1974).

Once the proper meaning is given to the legislative history, the rest of the majority's rationale loses much of its force. The court makes much ado, for example, about the effect of state law on the 1905 Act. The majority takes pains to point out that

water needed to be appropriated under Washington law, and that Wilson, the original grantee, carefully took all the necessary steps. These points are not in dispute. There is no question that Wilson validly obtained *all of the rights given* by the 1905 Act. The question remains, though, as to the extent of the rights granted. Because only Congress could give permission to dam the waters on a federal reservation, the grantee's compliance with state law only means that he received everything that the state could give him.

The fact that the Interior Secretary interpreted the statute to include the right to build a dam does not change the analysis. When the intent of Congress is as clear and unqualified as it is here, the actions of an enforcement officer cannot be allowed to override it. *Morton v. Ruiz*, 415 U.S. 199, 237, 94 S.Ct. 1055, 1075, 39 L.Ed.2d 270 (1974) (courts should not defer to agency interpretations that are inconsistent with congressional purpose); *ITT World Communications, Inc. v. Federal Communications Commission*, 725 F.2d 732, 741 (D.C. Cir.1984) (agency construction of statute should be accepted unless inconsistent with obvious congressional intent). It is ultimately for this court to decide what statutes mean, consistent with the legislative intent.

The common-sense interpretation of the 1905 Act does not, as the majority believes, make the statute void. Nothing in the Federal Power Act affects the right-of-way that *was* granted: the right to use the water and adjoining land. But because the legislative history makes it crystal clear that the Act did not give the right to construct a dam, FERC now has the authority to require that Washington Power obtain a license to operate the Little Falls project.

## C. *Collateral Estoppel*

I also do not think that the Commission is collaterally estopped in this case. Petitioner relies on *United States v. Big Bend Transit Co.*, 42 F.Supp. 459 (E.D.Wash. 1941), to support its claim that the govern-

ment is precluded from asserting that the 1905 Act only gave the right to use the water, not to dam it. In *Big Bend* the court assumed without actually deciding that the 1905 Act gave the respondent utility the right to build a dam. The Power Company argues that this case bars the government, through FERC, from relitigating the question.

The policy behind the doctrines of res judicata and collateral estoppel is to prevent relitigation of issues that were, or should have been, previously tried. *See* 18 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4403 (1981). One reason for this preclusion is to keep a party from being forced to go through the trouble and expense of relitigating a point it has already won. *Id.; United States v. Mendoza*, 464 U.S. 154, 104 S.Ct. 568, 78 L.Ed.2d 379 (1984). Although there is no longer a firm requirement of mutuality of parties between the two suits, *Allen v. McCurry*, 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980), a litigant seeking to invoke collateral estoppel must still show that

(1) the issue must have been actually litigated;

(2) the issue must have been "actually and necessarily determined by a court of competent jurisdiction" in the first trial; and

(3) preclusion in the second trial must not work an unfairness.

*Jack Faucett Associates, Inc. v. American Telephone and Telegraph*, 744 F.2d 118, 125 (D.C.Cir.1984), *cert. denied*, — U.S. ——, 105 S.Ct. 980, 83 L.Ed.2d 982 (1985), citing *Otherson v. Department of Justice, INS*, 711 F.2d 267, 273 (D.C.Cir.1983).

The points to be made in favor of collateral estoppel do not satisfy this three-part test. Although the *Big Bend* court obviously believed that permission to build a dam was included in the 1905 Act, 42 F.Supp. at 468, this determination was not necessary to the holding of the case. The court simply decided that in a condemnation proceeding, the value of the land along the Spokane included the value of the rights granted by the 1905 Act. Whether the right to construct a dam was included in the compensation owed to the land owner does not affect the question of whether the land should be valued for its potential as a power site, or for its current agricultural use. Because the question before us was not necessarily decided by the *Big Bend* court, collateral estoppel does not apply.

It also would be unfair to preclude a discussion of the main issue in this case. Although the United States was a litigant in the previous suit, and is present here through FERC, in fact the real party in interest is the Spokane Indian Tribe. It was the Indian Tribe that originally raised the argument that the Little Falls dam should be licensed in the proceedings below. Because the Indian Tribe did not have a chance to litigate the issue in *Big Bend*, it would be unfair now to bar the Tribe from fully pressing its claim.

CONCLUSION

I would affirm the Commission's decision to require the Power Company to apply for a license for the Little Falls project. The words of the statute—the right to "use" the river—are ambiguous enough to justify an examination of the legislative history. This history makes it so clear that the right to dam the river was *not* granted by the 1905 Act, that the majority's attempt to muddy the waters is a mystery. Our proper concern about excessive reliance on legislative history when the congressional intent is vague should not overwhelm us when the intent is clear. Because I think the majority has changed the intended meaning of the 1905 Act, I dissent.